**GOAT HILL DEVELOPMENT COMPANY, et al.,**
**Respondent,**

v.

**LAKE LOTAWANA ASSOCIATION, INC., et al, Appellant.**

**No. WD 62488.**

Missouri Court of Appeals,
Western District.

May 28, 2004.

Patrick B. Starke, Blue Springs, MO, for Appellant.

Mark J. Bredemeier, Lee's Summit, MO, for Respondent.

Before LOWENSTEIN, P.J., EDWIN H. SMITH and HOWARD, JJ.

HAROLD L. LOWENSTEIN, Judge.

Summary judgment was granted to Goat Hill Development Company (Goat Hill) in its declaratory judgment action to interpret agreements with Lake Lotawana Association, Inc. (the Association) as to what type of vessels would be allowed to dock on the lake owned by the Association. By virtue of agreements with predecessors, the Association gave Goat Hill (and lot owners living in the development) access rights to the lake. Goat Hill was permitted to build two community docks on Lake Lotawana, and each of its owners was allotted two slips, a powerboat slip and a

sailboat slip. The paramount issue here is whether this written permission allowed a Goat Hill owner to moor two powerboats in the owners' slips.

## I. FACTS

In 1995, Louise W. Rehn executed a settlement agreement (called a "development agreement") with the City of Lake Lotawana. One provision of the development agreement stated, "Two community docks with slips for sailboats with lifts as well as slips with lifts for powerboats and swimming docks shall be allowed and authorized by the City, subject to approval of location, design and size by the Association. Each of the lots ... shall be entitled to the use of one sailboat lift, one powerboat slip and lift, and shared use of the swimming dock." The development agreement also provided that "[a]ny and all transferees, successors and assignees of Mrs. Rehn shall have all of Mrs. Rehn's rights, benefits, duties, obligations, and liabilities under this [a]greement" and that "[u]pon Mrs. Rehn's sale of lots, the new lot owner(s) ... shall be subject to all [r]ules and [r]egulations of the Association."

As required by the development agreement, Rehn then entered into a separate agreement with the Association, the so-called "settlement agreement." Paragraph 5 of the agreement "allow[ed] Mrs. Rehn to construct and install two community docks for sailboats and power boats [sic]. Each lot ... will be entitled to one sailboat and one power boat slip." Subsection (a) of paragraph 5 was titled and dealt with the "dock location." Subsection (b) of paragraph 5 was titled and dealt with "dock specifications," providing that "[f]inal approval of the location and dimensions of said dock shall be issued by the Association after application by Mrs. Rehn at the time of platting." The only restriction on

use in paragraph 5 was that "no dock [be] used or [be] available for the use of any lot owner ... until such times as said lot owner has finished construction on a resident [sic] connected to a sewer on his or her said property[.]" Paragraph 4 of the settlement agreement gave Rehn an easement for sewer lines.

Neither agreement defined the terms "slip" or "sailboat slip" or "powerboat slip." The Association's rules and regulations, while defining the terms "dock," "sailboat," "covered dock," and "motorboat," did not define the terms "slip" or "sailboat slip" or "powerboat slip." The rules and regulations did not forbid the mooring of powerboats in sailboat slips. The only use restriction in the rules and regulations was that "[n]o owner/member shall moor a watercraft in such a manner as to deny access to the mooring of another owner/member's watercraft, to either side, front or back of a structure (dock/lift) for which it was designed."

In 1996, Rehn sold to Goat Hill Development Company her remaining interests in the property that was subject to the settlement and the development agreements. Ewald Moerschel, the president and principal shareholder of Goat Hill and also one of the lot owners in the Goat Hill development, sought a permit from the Association to moor a powerboat in each of his two slips. The Association refused Moerschel's application. It told him that it was the Association's "position ... that each property owner at [Goat Hill] will be allowed to park one power boat [sic] and one sail boat [sic] at the community dock."

Moerschel and Goat Hill then filed this declaratory judgment action. The petition sought a declaration, on behalf of Moerschel, current Goat Hill lot owners Charles and Alice Quesenberry, and "other and future Goat Hill lot owners," that neither the development nor the settlement agree-

ment, nor the Association's rules and regulations forbid Goat Hill lot owners from mooring powerboats in uncovered slips, dubbed "sailboat slips" by Moerschel. In the Association's answer, it contended, among other things (*see infra* note 1), that a "sailboat slip" is a slip used to moor a sailboat, but not any other boat, such as a powerboat. It did not contest Moerschel's tacit assumption that each Goat Hill lot owner had the Association's permission to use two powerboats on the lake. Nor did the Association deny Moerschel and other Goat Hill lot owners as successors in interest to the settlement agreement.

The parties filed cross-motions for summary judgment. The trial court rejected the Association's motion and granted Goat Hill's, holding that the term "sailboat slip" is reference to the structure, not to the permitted use of the slip. The Association then brought this appeal.

## II. STANDARD OF REVIEW

Summary judgment is only proper if there is no material dispute of fact and the movant is entitled to judgment as a matter of law. *Margulis v. P & M Consulting, Inc.*, 121 S.W.3d 246, 249 (Mo.App.2003). Review of the grant of summary judgment is *de novo*, with the record reviewed in a light most favorable to the non-movant. *Id.*

## III. ANALYSIS

■ The Association and Goat Hill construe paragraph 5 of the settlement agreement as a restrictive real covenant. If it were a restrictive covenant, the Association, which owns Lake Lotawana and its shoreline, would be the owner of the servient estate, since the provisions restrict the Association's use of the Lake, at least

indirectly. (The Association must not prevent Goat Hill lot owners from building, using, and accessing their sailboat and powerboat slips.) And thus the Association, and not Goat Hill, would benefit from the rule, if it were applicable (it isn't, *see infra*), that ambiguous restrictive covenants must be narrowly interpreted in favor of the free use of one's land. *Blevins v. Barry-Lawrence County Ass'n for Retarded Citizens*, 707 S.W.2d 407, 408 (Mo. banc 1986); *Mackey v. Griggs*, 61 S.W.3d 312, 315 (Mo.App.2001). *See also Hammarstrom v. Samsel*, 114 S.W.3d 889, 890 (Mo.App.2003) ("Restrictive covenants on realty are strictly construed as the law favors untrammeled use of real estate.").

■ However, these provisions are not restrictive real covenants. Restrictive real covenants are limitations on the *owner's* (here, the Association) use of its land, such as an agreement not to raise pigs or not to build a structure that is over two stories high on one's land. True, paragraph 5 bars the Association from interfering with the Goat Hill lot owners' construction, access, and use of the slips in question. But if this indirect limitation were enough to transform paragraph 5 into a restrictive covenant, every easement, every irrevocable license to use another's realty would be a restrictive covenant. Paragraph 5, like paragraph 4 before it, gave the Goat Hill lot owners easements—i.e., "nonpossessory interest[s] . . . in the land in the possession of another which entitles the owner of such interest to a limited use or enjoyment of the land in which the interest exists." *Gilbert v. K.T.I., Inc.*, 765 S.W.2d 289, 293 (Mo.App.1988).

■ The only real issue [1] on appeal is whether the Goat Hill lot owners' use of

1. In its answer, the Association claimed that the Quesenberrys were necessary parties. Even if they were, their nonjoinder did not

deprive the trial court (or this court) of jurisdiction. *Matter of Sweeney*, 899 S.W.2d 886, 889 (Mo.App.1995); *Massey v. Long*, 608

so-called "sailboat slips" to moor powerboats or any other kind of boat would exceed the scope of their easement allowing them to build, access, and use one sailboat slip and one powerboat slip each.[2] The scope of an easement is based on the intent of the parties to the conveyance or contract that created the easement. *Erwin v. City of Palmyra*, 119 S.W.3d 582, 584–85 (Mo.App.2003). Interpretations that involve unreasonable results must be rejected. *Blackburn v. Habitat Dev. Co.*, 57 S.W.3d 378, 386 (Mo.App.2001).

The plain meaning of the phrase "sailboat slip," according to the Association, is a slip used to moor sailboats, but not any other boats, including powerboats. What else, the Association asks, would be the point of using the word "sailboat" to modify "slip," if not to restrict how the slip may be used? The correct answer—and the one given by the trial court—is that the adjective "sailboat" limits the type of structure to a slip that can accommodate sailboats (e.g. by not being covered, unlike powerboat slips). That the appellation "sailboat slip" is a structural, and not a use restriction, is supported by the context of the development agreement. *See McPherson v. U.S. Physicians Mut. Risk Retention Group*, 99 S.W.3d 462, 483 (Mo.App. 2003) (using context as an interpretive aid). Subsections (a) and (b) of paragraph 5 of the settlement agreement (the paragraph giving each lot a right to one sailboat slip and one powerboat slip) dealt with the dock location and dock specifica-

tions, respectively-that is, structural matters. There is a use restriction in paragraph 5 (to wit, that "no dock [be] used or [be] available for the use of any lot owner ... until such times as said lot owner has finished construction on a resident [*sic*] connected to a sewer on his or her said property"), but it is explicit. This further undermines the Association's claim that a use restriction is embedded in the phrase "sailboat slip."

The Supreme Court recognized the distinction between a structural and a use restriction in *Blevins*. *See supra*. In *Blevins*, homeowners sought to enjoin the Blevins from operating a group home for the retarded. 707 S.W.2d at 407. The homeowners claimed, among other things, that a restrictive covenant which prohibited the Blevins from erecting, altering, placing, or permitting any building "other than a single or double family dwellings not to exceed two and one-half stories in height and private garages for not more than two cars" precluded non-family members from living in the same building. *Id.* at 410. And thus, according to the homeowners, the home for the retarded, in which people who were not family members were going to live, would violate the covenant. *Id.* The Supreme Court disagreed. It held that the phrase "family dwelling" was clearly a structural restriction, not a use restriction. *Id.*

The Association submits that "[t]he [t]rial [c]ourt's declaration that a powerboat

---

S.W.2d 547, 551 (Mo.App.1980). The Association also alleged that Goat Hill and Moerschel were not the real parties in interest— that is, that they lacked standing—because they "were not the legal title holder of the real estate at the times mentioned in [their] [p]etition." This court cannot find any factual basis for the Association's contention. Goat Hill and Moerschel did own property subject to the settlement agreement when the petition was filed, so they obviously have standing. The Association made other argu-

ments (e.g., about the ripeness of the petition and Goat Hill's alleged failure to exhaust its administrative remedies) that are patently meritless.

2. The Association has never argued that by denying Moerschel's application for a permit, the Association in effect modified the rules and regulations to forbid the mooring of powerboats in sailboat slips.

can be placed in a sailboat lift renders the term 'sailboat lift' meaningless, contrary to the case law." This is not true. As *Blevins* makes clear, the word "sailboat" limits the type of slip the Goat Hill lot owners can build on the Lake. Just as the phrase "family dwelling," which was surrounded by structural language, was a structural limitation, so, too, is the phrase "sailboat slip," which also is surrounded by structural language (i.e., dock specifications). *See also Weber v. Les Petite Academies*, 548 S.W.2d 847, 852 (Mo.App.1976) ("[W]e will not interpret restrictions on construction so as to create restrictions on use.").

If accepted, the Association's next claim—that "how the slip is used defines the type of slip. Parking a powerboat in a slip makes it a 'powerboat slip,' and so on"—would justify the Association's denial of Moerschel's application for a permit. For Moerschel had already moored a powerboat in one slip, and to allow him to moor another powerboat in a second slip would, according to the Association's interpretive theory, give him two "powerboat slips," in violation of paragraph 5 of the settlement agreement. However, the Association's use theory of meaning, besides flying in the face of the rationale of *Blevins* and being undermined by the text of paragraph 5, would *require* each lot owner to moor a powerboat in one slip and a sailboat in another. If a lot owner did not do so, the unused slips would be neither sailboat nor powerboat slips, according to the Association's use theory, and thus would exceed the scope of the lot owner's easement. It is absurd to think that the parties intended to *compel* each lot owner to moor a sailboat and a powerboat in two slips. Because absurd interpretations of agreements are verboten, *Sonoma Mgmt. Co. v. Boessen*, 70 S.W.3d 475, 481 (Mo. App.2002), the Association's use theory must be rejected. If all the Association meant to say is that it is a misuse of a sailboat slip to moor a powerboat in it, the Association begs the question by assuming the term "sailboat slip" is a use restriction in order to prove that Moerschel's proposed use of the slips is a misuse.

This court next notes a lacuna in the Association's argument. The Association has never denied Goat Hill lot owners' right to use two powerboats on Lake Lotawana. If they didn't have this right, it would have been a strong support for the Association's interpretation of the scope of the lot owners' easement. It is possible that some other agreement, ordinance, rule or regulation prohibits such use of the lake. If so, surely the Association would have invoked it. If, as seems likely, each lot owner may run two powerboats on the lake, why then does the Association oppose allowing the Goat Hill lot owners' the right to moor two powerboats? Aesthetic considerations—a quieter lake (because without a place to moor a second powerboat, it is less likely two powerboats will be used on the lake), a prettier dock—may explain the Association's stance. However, the Association does not give any explanation, aesthetic or otherwise, why it would want to prohibit the Goat Hill lot owners from mooring a powerboat in a sailboat slip. This further undermines the Association's position, *Braden v. von Stuck*, 950 S.W.2d 489, 494 (Mo.App.1997) ("In making its interpretation, the court must look to the entire agreement and consider the object, nature, and purpose of the agreement.")

The Association has conceded that the other members of the Association not subject to the settlement agreement (Goat Hill lot owners are also members of the Association) routinely "moor[ ] powerboats to uncovered slips, swim docks, gang or community docks, even the shore." Assuming, for the sake of argument, that, as the Association contends in one of its points, the term "sailboat slip" is equivocal,

this court would be obliged to interpret the term "in light of all the surrounding circumstances, including applicable customs and usages[.]" *Graham v. Goodman,* 850 S.W.2d 351, 355 (Mo. banc 1993). The Association's attitude toward how its non-Goat Hill members moor their powerboats makes reasonable Goat Hill's understanding that the Association did not care about the use of sailboat slips, only that they meet certain structural requirements.[3]

If the parties had wanted to prohibit the mooring of powerboats in sailboat slips, it would have been much easier for the parties to say so explicitly. That they didn't is one more reason to reject the Association's interpretation. *See Am. Standard Ins. Co. v. Hargrave,* 34 S.W.3d 88, 91 (Mo. banc 2000).

The judgment of the trial court is affirmed.

All concur.

---

3. The Association is, of course, correct when it says that merely because the non-Goat Hill members have certain rights, it doesn't follow that the Goat Hill members have the same rights. Goat Hill does not disagree. Goat Hill is merely adducing the circumstances surrounding the agreement as evidence of its understanding of what the agreement allowed and required.