Karen King Mitchell, Chief Judge
Robert C. Smock, as trustee of the Robert C. Smock Revocable Living Trust; T & K Smock, LLC; and Joshua and Jessie Smock (collectively, the Smocks) appeal an order granting summary judgment to Associated Electric Cooperative, Inc. (Cooperative) on the grounds that the Smocks' claims are time-barred. The Smocks argue that the motion court erred in granting summary judgment because their claims fall within the continuing-wrong exception to accrual of the limitations periods. If applicable, the exception would allow the Smocks to recover for damage occurring during the limitations period immediately preceding the filing of their petition. The Smocks further argue that the motion court erred in granting summary judgment on their contract claim because it accrued when Cooperative refused payment *215 and, thus, was timely filed. Because we find that the Smocks' claims are barred by the applicable statutes of limitations, we affirm the motion court's grant of summary judgment on all counts.
Background[1]
On December 20, 1990, William and Jeanette Smock granted Cooperative a 150-foot-wide electric-transmission-line easement over a portion of their farm in Holt County, Missouri.[2] Under the easement agreement, William and Jeanette, as Grantors, granted Cooperative
a perpetual easement right, privilege and authority to enter upon the lands of the Grantor to construct, reconstruct, erect, add to, rebuild, modify, level, repair, replace, patrol, operate and maintain on, over and under the described lands, ... an electric transmission line of one or more circuits, including, but not limited to, poles, towers, wires, buried cable, guys, brace poles, guy wires, anchors and other appurtenances necessary thereto....
Other pertinent provisions of the easement agreement include the following:
Grantor does also hereby grant, bargain, sell and convey to Cooperative the perpetual right to clear and keep clear by cutting, trimming, spraying or removing by any other manner all brush, trees and timber within seventy-five (75) feet of the centerline of said electric transmission line and all other trees which, in the opinion of the Cooperative, would endanger or be a hazard to the operation and maintenance of the lines.
The sole consideration to be paid by Cooperative to Grantor for the rights and privileges herein granted shall be thirteen thousand two hundred thirty dollars ($13,230.00 ) to be paid within ninety (90) days from the execution of this instrument. No construction on this easement shall be commenced until said amount is paid.
Cooperative agrees to pay additional to Grantor the actual damages to Grantor's real property, growing annual crops and fences when and if such damage occurs, occasioned by the exercise of any of the rights granted herein, it being understood that this agreement for further payment is not intended to and shall not provide additional payment for the cutting and trimming of trees, nor for the exercise of any of the rights of the easement itself, which rights are granted for the sole consideration specified in the paragraphs set forth above.
(Emphasis in original.)[3]
After the easement was executed, Jeanette granted Cooperative's contractor access to the area covered by the easement agreement to begin the clearing process, which was completed by early 1992. Robert observed the clearing of several large oak trees from the pasture area and of "many more" trees from the area closer to the Nodaway River, which borders the *216 Smocks' farm to the east. The contractor cleared only those trees that were within the easement's boundaries.
A portion of the easement covers a slope of ground on the Smock farm leading down to the river. Over time, the root systems of the cleared trees deteriorated, and without roots to hold the soil in place, the land in that area of the easement destabilized and began sliding into the river. By or before the spring of 2005, the Smocks became aware of damaging erosion of the slope within the easement boundaries as is evidenced by the fact that they moved the part of their livestock fence that was on the easement back from the river to prevent the fence from collapsing. Robert testified that he thinks "it was 2005 ... where [he] started to really see the damage start." Later he clarified that it was "probably spring" of 2005. Both Travis and Joshua testified that erosion of the slope became an issue for the family in 2005.[4] Travis believed that the livestock fence had been moved back from the river even before 2005.[5] Robert had to replace the fence three times, moving the fence line back roughly twenty feet each time. Eventually, the Smocks decided to exit the livestock business; in 2015, they began planting crops in this portion of their farm, including within the easement boundaries along the Nodaway River.
Robert and Joshua testified that the rate of erosion accelerated in 2012. Sometime in the last five years, the erosion extended beyond the boundaries of Cooperative's easement. And the eroded area continues to grow, encroaching on additional tillable farmland.
In 2014, Robert demanded that Cooperative address the erosion pursuant to the easement, but Cooperative declined, concluding that its clearing activities were not the cause of the erosion.
The Smocks filed their initial Petition on September 11, 2015,[6] and later filed a First Amended Petition that included four counts: (1) breach of contract, (2) negligence, (3) trespass and violation of § 537.340,[7] and (4) temporary nuisance and inverse condemnation. Cooperative moved for summary judgment on all claims.[8] The court heard arguments on Cooperative's motion and, on December 12, 2017, issued an "Order Granting Summary Judgment" on all counts.[9] This appeal follows.
*217 Standard of Review
Whether the circuit court properly entered summary judgment "is purely an issue of law which th[e c]ourt reviews de novo. " Hill v. Ford Motor Co. , 277 S.W.3d 659, 664 (Mo. banc 2009) (citing ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp. , 854 S.W.2d 371, 376 (Mo. banc 1993) ). Under the de novo standard of review, appellate courts use the same decision criteria as the lower courts. Id. Thus, we will affirm summary judgment if there is no genuine dispute as to any material fact and the moving parties are entitled to judgment as a matter of law. Rule 74.04(c)(6);[10] ITT Commercial Fin. Corp. , 854 S.W.2d at 376. For defendants seeking summary judgment on a properly pleaded affirmative defense, the facts required to support the defense must not be genuinely disputed. Id. at 381. "The statute of limitations is an affirmative defense, and respondents who move for summary judgment on that basis bear the burden of showing that it bars plaintiff's claims." Powel v. Chaminade Coll. Preparatory, Inc. , 197 S.W.3d 576, 580 (Mo. banc 2006) (internal citation omitted).
Analysis
The Smocks raise four points on appeal. They argue that the motion court erred in granting summary judgment (1) on their trespass claim because that claim falls within the continuing-wrong exception to the statute of limitations (Point I); (2) on their temporary nuisance claim because it also falls within the continuing-wrong exception (Point II); (3) on their negligence, trespass, and temporary nuisance claims because Cooperative violated its common law duty to repair the existing erosion and to maintain the easement so as to prevent future erosion, which constitutes a continuing wrong (Point III); and (4) on their contract claim because it was timely filed pursuant to the easement agreement and, alternatively, the continuing-wrong exception applies to that claim.[11]
*218 Because most of the Smocks' claims of error involve the continuing-wrong exception to the statute of limitations, we begin by discussing claim accrual and the continuing-wrong exception.
"Generally, 'a statute of limitation[s] begins to run when the cause of action has accrued to the person asserting it, the accrual being whenever such a breach of duty has occurred, or such a wrong has been sustained, as will give a right then to bring and sustain a suit.' " D'Arcy & Assocs., Inc. v. K.P.M.G. Peat Marwick, L.L.P. , 129 S.W.3d 25, 29 (Mo. App. W.D. 2004) (quoting Davis v. Laclede Gas Co. , 603 S.W.2d 554, 555 (Mo. banc 1980) ); see also § 516.100 ("Civil actions ... can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued...."). "A cause of action initially accrues, under § 516.100, when a party could first maintain the action successfully." Modern Tractor & Supply Co. v. Leo Journagan Constr. Co., Inc. , 863 S.W.2d 949, 952 (Mo. App. S.D. 1993).
Accrual takes place not "when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment." § 516.100. "Damage is capable of ascertainment when it can be discovered or is made known, even if its extent remains unknown." D'Arcy , 129 S.W.3d at 29. "Accrual requires only that some damage be sustained and be capable of being ascertained. That further damage may occur does not matter." Id. (internal citation omitted). In other words, "a cause of action accrues when a plaintiff has some notice or awareness that he has suffered an injury or that another individual has committed a legal wrong which may result in harm to the plaintiff." Warren Cty. Concrete, L.L.C. v. Peoples Bank & Trust Co. , 340 S.W.3d 289, 291 (Mo. App. E.D. 2011). At that point, the limitations period begins to run.
Under the continuing-wrong exception to traditional accrual, "each continuation or repetition of wrongful conduct may be regarded as a separate cause of action for which suit must be brought within the period beginning with the occurrence." Lake St. Louis Cmty. Ass'n v. Oak Bluff Pres. , 956 S.W.2d 305, 310 (Mo. App. E.D. 1997) (quoting Vogel v. A.G. Edwards & Sons, Inc. , 801 S.W.2d 746, 755 (Mo. App. E.D. 1990) ). The Missouri Supreme Court first recognized the exception in Davis v. Laclede Gas Company , where the Court suggested that it would not extend the exception much beyond the "peculiar and particular circumstances" of that case, where "the wrong may [have] be[en] said to continue from day to day, ... to create a fresh injury from day to day, and [it wa]s capable of being terminated." Davis , 603 S.W.2d at 556.
In applying the continuing-wrong exception, this court has held that "[d]amages resulting from one completed, wrongful act, although they may continue to develop, are not adequate." D'Arcy , 129 S.W.3d at 30. "When there is only one wrong, which results in continuing damage, the cause of action accrues when that wrong is committed and the damage sustained is capable of ascertainment." Randolph v. Mo. Highways & Transp. Comm'n , 224 S.W.3d 615, 619 n.4 (Mo. App. W.D. 2007). "Damage resulting from one wrong that continues and becomes *219 more serious over time does not extend the time within which suit may be brought." D'Arcy , 129 S.W.3d at 30 (quoting Bus. Men's Assurance Co. of Am. v. Graham , 891 S.W.2d 438, 446 (Mo. App. W.D. 1994) ); see also Ball v. Friese Constr. Co. , 348 S.W.3d 172, 178 (Mo. App. E.D. 2011) (finding that, where plaintiff discovered damage from alleged inadequate construction many years before filing suit, there were no continuing wrongs when the problem became worse over the years; instead, there was only one wrong, where damages were apparent but continued to develop, and the action accrued when the fact of damage was capable of ascertainment).
We now turn to the Smocks' specific points on appeal.
I. The Smocks' claims for trespass and injunctive relief are time-barred.
In Point I of their appeal, the Smocks argue that the motion court erred in granting summary judgment on their trespass and injunctive relief claims because Cooperative's trespass is continuing in nature, and therefore the continuing-wrong exception applies and the Smocks may seek recovery for damages incurred during the limitations period immediately preceding initiation of their lawsuit. We disagree.
"[T]respass involves interference with the plaintiffs' possessory rights and requires an intentional act that results in a physical invasion of the plaintiffs' property...." Cook v. DeSoto Fuels, Inc. , 169 S.W.3d 94, 102 (Mo. App. E.D. 2005). The Smocks' trespass and injunctive relief claims are subject to a five-year statute of limitations. § 516.120(3); see Hall-Bouldin v. Bouldin , 497 S.W.3d 385, 390 (Mo. App. E.D. 2016) (applying statute of limitations to claims in equity).
Under traditional accrual, the undisputed material facts establish that these claims are time-barred. Robert, Travis, and Joshua testified that they were aware of the damage to the easement by the spring of 2005, as is evidenced by the fact that they moved the fence back from the river due to erosion.[12] The Smocks filed their initial petition on September 11, 2015, more than ten years after discovery of the injury and substantial damage. Thus, on its face, the five-year limitations period expired before this lawsuit commenced, which the Smocks essentially concede by arguing that their trespass and injunctive relief claims are saved by the continuing-wrong exception.
The continuing-wrong exception does not apply to the Smocks' trespass and injunctive relief claims, however, because the injury emanates from a completed act-the removal of trees and brush from the easement in 1991 and 1992. Even if Cooperative's conduct in clearing the easement was tortious, a finding we do not make, that conduct was completed by 1992, according to the undisputed material facts in the record. The wrong, if any, therefore, was not continuing. The damage or injury allegedly inflicted has continued to develop over the years, but it did not result from repeated wrongful conduct.
The Smocks rely primarily on Cook v. DeSoto Fuels, Inc. , 169 S.W.3d 94 (Mo. App. E.D. 2005) to support their claim of a continuing trespass. In Cook , the plaintiff landowners alleged that gasoline leaking *220 from underground storage tanks on the defendant property was contaminating the plaintiffs' soil and groundwater. Id. at 99. The plaintiffs filed suit in March 2001, asserting claims for negligence, trespass, and nuisance. Id. at 100. The plaintiffs had noticed signs of contamination as early as 1993 and had notified the Missouri Department of Natural Resources (DNR), which performed an inspection and issued a preliminary report in March 1994. Id. In March 1996, DNR issued a final report finding that the plaintiffs' well water was contaminated with gasoline and identifying four nearby gas stations as potential sources, including the defendant's station. Id. DNR drilled two monitoring wells and, in September 1997, confirmed that the contamination had originated from the defendant's gas station. Id.
The circuit court granted summary judgment on the trespass claim in the gas station's favor based on the statute of limitations, but the Eastern District of this court reversed, finding that the plaintiffs had sufficiently pleaded a continuing or repeated invasion of their property. Id. at 106. In particular, the court pointed to the plaintiffs' allegations of "continuing entry, trespass, and intrusion onto Plaintiffs' property by the petroleum products from the Station without Plaintiffs' permission." Id. at 105. The court also noted that the petition referred to "the releases" in the plural form. Id. Because the plaintiffs had alleged repeated wrongs on the part of the defendants that caused injury, the court found that plaintiffs alleged a "fresh injury from day to day," and the court found nothing in the record to indicate the wrong was incapable of being terminated. Id. (quoting Davis , 603 S.W.2d at 556 ).
Of particular relevance for the present case, the defendant in Cook asserted that there had been only a single release of gasoline from its tanks. Id. In response, the court "agree[d] that the existence of a single leak [with] migration of contaminants would not constitute a continuing wrong, even if the contaminants remained present in the ground." Id. "The mere presence of contaminants does not reveal whether there was one wrong resulting in continuing damage, or whether there were continuous or repeated wrongs that created fresh injuries from day to day and were capable of being terminated." Id. at 106.[13] In other words, in Cook the court found that the record adequately presented a claim for a continuing trespass based on multiple releases of petroleum from the defendant's gas station as opposed to a single release with continued migration of the petroleum over time. Id. Accordingly, the court reversed the award of summary judgment and remanded the case for further proceedings consistent with its ruling on the statute of limitations defense. Id.
The record in the present case shows that there was one act, completed by 1992, that allegedly caused the damage at the heart of the Smocks' suit. And, the fact that the alleged effects of that act are continuing and even expanding does not transform the act into a continuing trespass.
We likewise find unavailing the Smocks' arguments that Cooperative's trespass is ongoing because Cooperative has exceeded the scope of its transmission-line easement and because the alleged damage has expanded beyond the easement's boundaries.[14] The scope of an easement *221 is determined by the expressed intent of the parties. See Goat Hill Dev. Co. v. Lake Lotawana Ass'n, Inc. , 134 S.W.3d 807, 811 (Mo. App. W.D. 2004) (the scope of an easement is based on the expressed intent of the parties); Burg v. Dampier , 346 S.W.3d 343, 356 (Mo. App. W.D. 2011) (the express terms of an easement are to be enforced).[15] Here, the express terms of the easement contradict the Smocks' argument.
The easement expressly authorized Cooperative to remove all trees and brush in the easement, which is what Cooperative did, according to the undisputed evidence.[16] Thus, Cooperative's only acts within the easement were those expressly authorized by the easement agreement. None of the trespass cases cited by the Smocks in support of their position involved conduct expressly authorized by the terms of an easement; thus, those cases are distinguishable.[17]
Because the Smocks were aware, by the spring of 2005, that the family farm had sustained damage, and tort claims accrue when damage can be ascertained-not when the precise amount of damage is known-the motion court correctly granted Cooperative's motion for summary judgment on the Smocks' trespass and injunctive relief claims. Point I is denied.
II. The Smocks' claims for temporary nuisance and injunctive relief are time-barred.
In Point II, the Smocks argue that the motion court erred in granting summary judgment on their temporary nuisance and injunctive relief claims because they also fall within the continuing-wrong exception.[18] We disagree.
"Nuisance is the unreasonable, unusual, or unnatural use of one's property so that it substantially impairs the right of another to peacefully enjoy his [or her] property." Miller v. City of Wentzville , 371 S.W.3d 54, 57 (Mo. App. E.D. 2012) (quoting *222 Basham v. City of Cuba , 257 S.W.3d 650, 653 (Mo. App. S.D. 2008) ). The Smocks assert that Cooperative's use of the easement constitutes a nuisance because the use is unreasonable and it substantially impairs their right to enjoy their property. But the only uses Cooperative has made of the easement-removal of trees and brush and installation and maintenance of the transmission line-were expressly authorized by the easement agreement, and therefore, were not unreasonable and cannot be the basis for a finding of a nuisance. Instead, the Smocks argue that the erosion-not the removal of trees and brush-is the nuisance. But, even if the erosion, under the facts of this case, were a nuisance, which we do not find, the Smocks' nuisance claim is time-barred.
The Smocks' second point is premised on this alleged nuisance being temporary. "A nuisance is temporary if it may be abated, and it is permanent if abatement is impractical or impossible." McGinnis v. Northland Ready Mix, Inc. , 344 S.W.3d 804, 812 (Mo. App. W.D. 2011) (quoting Peters v. ContiGroup , 292 S.W.3d 380, 385 (Mo. App. W.D. 2009) ). "The distinguishing feature between a permanent and temporary nuisance is the 'abatability' of the nuisance." Campbell v. Anderson , 866 S.W.2d 139, 143 (Mo. App. W.D. 1993) (quoting Racine v. Glendale Shooting Club, Inc. , 755 S.W.2d 369, 374 (Mo. App. E.D. 1988) ). "When a nuisance can be reasonably and practically abated, it is a temporary nuisance. It is a question of law, rather than fact, whether a nuisance is permanent or temporary." Id. (citing Schwartz v. Mills , 685 S.W.2d 956, 958 (Mo. App. E.D. 1985) ).
"The character of the source of the injury and not the character of the injury determines whether a nuisance is permanent or temporary." Id. (emphasis added). Further, the source of the injury must be subject to immediate alteration so as to remedy the injury. The Campbell court distinguished between permanent and temporary nuisances based on whether the nuisance could be immediately abated upon order of the court. Id. (characterizing cases describing "structures which do not have the potential to be removed the day after the verdict" as involving permanent nuisances). Focusing, as we must, on the source of the injury-the removal of trees (including their root system) and brush-the trees, brush, and root system cannot be reasonably and practically replaced quickly so as to end the erosion. Thus, we question the Smocks' premise that the alleged nuisance is temporary, but we are not required to decide that issue in order to determine whether their nuisance claim was timely filed.
Even if the alleged nuisance, under the facts of this case, were temporary, the Smocks misconstrue the application of the statute of limitations[19] for temporary nuisances. The Smocks argue that a temporary nuisance claim is, by definition, a continuing wrong. In other words, the Smocks claim that as long as the temporary nuisance continues to exist, the continuing-wrong exception automatically applies. But, if this were true, the ten-year statute of limitations for actions claiming an injury from a temporary nuisance would be meaningless because, as long as the alleged temporary nuisance existed, the ten-year statute of limitations period *223 would always begin to run anew. Rather, "[t]he period of limitation as to a temporary nuisance ... runs anew from the accrual of the injury from every successive invasion of interest. " Id. (quoting Rebel v. Big Tarkio Drainage Dist. , 602 S.W.2d 787, 792 (Mo. App. W.D. 1980) ) (emphasis added). In other words, the statute of limitations runs from when the injury reoccurs. In this case, the only "invasion of interest" began sometime before the spring of 2005, when the ground on the Smocks' farm began to erode.[20] And, based on the undisputed material facts, the Smocks were aware of the erosion by the spring of that year, so any claim for temporary nuisance would be time-barred.
Point II is denied.
III. Cooperative does not have a common-law duty to repair the existing erosion or to prevent future erosion so as to provide a basis for a continuing-wrong exception to the applicable statute of limitations.
In Point III, the Smocks argue that the motion court erred in granting summary judgment on their negligence, trespass, and temporary nuisance claims and their associated claims for injunctive relief because Cooperative violated its common-law duty to repair the existing erosion and to maintain the easement so as to prevent future erosion. The Smocks claim that this failure constitutes a basis for the continuing-wrong exception to the applicable statutes of limitations.[21] Again, we disagree.
The Smocks assert that, under Missouri law, the holder of an easement has a common-law duty to repair and maintain the easement. While it is true that, under Missouri law, the dominant estate (in this case Cooperative) has a common-law duty to maintain and repair an easement, that duty is no broader than the easement itself. See Rollins v. Schwyhart , 587 S.W.2d 364, 367 (Mo. App. S.D. 1979) (en banc) (declining to imply from the terms of a roadway easement agreement, or the dominant estate's ownership and use of the easement, an obligation by the dominant estate to maintain portions of the roadway where the agreement required the dominant estate to install and maintain two cattle guards but otherwise was silent as to maintenance, and the servient estate reserved an equal right to use the roadway). Thus, the question is whether the terms of the easement agreement require Cooperative to maintain the 150-foot-wide strip of land over which the utility power lines were placed.
The easement at issue in this case provides:
a perpetual easement right, privilege and authority to enter upon the lands of the Grantor to construct, reconstruct, *224 erect, add to, rebuild, modify, level, repair, replace, patrol, operate and maintain on, over and under the described lands, ... an electric transmission line of one or more circuits, including, but not limited to, poles, towers, wires, buried cable, guys, brace poles, guy wires, anchors and other appurtenances necessary thereto....
The easement granted Cooperative the right to place its electrical transmission line on a 150-foot-wide strip of ground owned by the Smocks and to "clear and keep clear by cutting, trimming, spraying or removing by any other manner all brush, trees and timber within seventy-five (75) feet of the centerline of said electrical transmission line...." The Smocks characterize the easement as granting Cooperative complete control of and responsibility for the 150-foot strip of land upon which they placed their power transmission line. But this is inaccurate. Cooperative has only the rights granted by the easement, i.e. , to place a power line over the portion of the Smocks' property and to remove trees and brush to facilitate the operation of the power line. In all other respects, the Smocks retain their right to use the property over which the easement runs. As a result, Cooperative's duties are similarly limited.
Further, the easement agreement speaks directly to Cooperative's duty to maintain. The agreement provides that Cooperative shall, among other things, "rebuild, modify, ... repair, replace, ... and maintain ... an electric transmission line on, over and under" the Smocks' farm, including all "poles, towers, wires, buried cable, guys, brace poles, guy wires, anchors and other appurtenances necessary thereto...." The easement imposes no duty upon Cooperative to maintain or repair the ground surface over which the easement runs, which makes sense because Cooperative's only rights relate to running power lines, and the Smocks retained and used the right to conduct livestock and farming operations within the easement's boundaries. Under the terms of the easement, Cooperative has only a limited right to use, and no duty to repair or prevent erosion on, the property to which the easement applies. See Rollins , 587 S.W.2d at 367 (finding that, where the easement agreement imposed an obligation only to install and maintain cattle guards on the roadway, "we do not think additional maintenance can be required where some is provided for").
The Smocks cite three easement cases in support of their claim that the holder of the dominant estate has a common law duty to repair and maintain the easement- Kibbons v. Union Electric Company , 823 S.W.2d 485 (Mo. banc 1992) ; Heffernan v. Reinhold , 73 S.W.3d 659 (Mo. App. E.D. 2002) ; and Gnau v. Union Electric Company , 672 S.W.2d 142 (Mo. App. E.D. 1984). These cases state generally that, in the absence of an agreement to the contrary, the owner of an easement bears responsibility for keeping the property in repair and is liable for any injury resulting from the failure to repair. Kibbons , 823 S.W.2d at 488 ; Heffernan , 73 S.W.3d at 667 ; Gnau , 672 S.W.2d at 145. However, those statements must be viewed in the context of the facts of those cases. All three of the easements in those cases were granted so that the dominant estate holder could run utility infrastructure across the easement ( Kibbons and Gnau involved electrical lines, and Heffernan involved sewer pipes). In each case, a third party was injured as a result of the dominant estate holder's operation of the utility (in the case of Kibbons and Gnau, the third party came into contact with the electrical lines, and in Heffernan , the third party was injured when the walls of a trench collapsed while repairs to the sewer line *225 were being attempted). In finding the servient estate holder not liable to the third party, the courts focused on the fact that the servient estate holder is liable for injuries caused only by devices placed on the premises that are under the servient estate holder's possession and control. Heffernan , 73 S.W.3d at 667 (citing Kibbons , 823 S.W.2d at 488 ). "In other words, a [servient estate holder] has no duty to maintain or repair ... conditions on the easement that are in the sole control of the holder of the easement." Id.
Applying the holdings in Kibbons , Gnau , and Heffernan to a situation in which the claim is against the dominant estate holder, it appears that the dominant estate holder has a common law duty to repair and maintain aspects of the easement that are in its sole control. Thus, in the present case, had the Smocks sued for an injury arising from devices placed on the easement by Cooperative that were under Cooperative's exclusive control, the grant of summary judgment would have been inappropriate. But, here where the claims were based on the failure to maintain the property over which the easement runs and over which Cooperative does not have exclusive control, no common law duty exists.[22]
Point III is denied.
IV. The Smocks' contract claim is time-barred.
In their final point on appeal, the Smocks argue that the motion court erred in granting summary judgment on their claim for breach of contract because it was timely filed pursuant to the easement agreement and, alternatively, the continuing-wrong exception applies. We reject both arguments.
The Smocks' breach of contract claim is based on the following provision of the easement agreement: "Cooperative agrees to pay additional to Grantor the actual damages to Grantor's real property ... when and if such damage occurs, occasioned by the exercise of any of the rights granted herein...." The parties disagree about which statute of limitations governs the Smocks' contract claim. The Smocks argue that their claim is subject to the ten-year limitations period in § 516.110(1) because the claim is based upon a writing for the payment of money.[23] In contrast, Cooperative asserts that the Smocks' contract claim is subject to the five-year limitations period in § 516.120.[24] We need not resolve this dispute because the real issue is when the Smocks' contract claim accrued. This is *226 because, if the Smocks' cause of action for breach of contract accrued before the spring of 2005, as Cooperative claims, even the ten-year statute of limitations ran before this suit was filed, and if the Smocks' cause of action accrued in 2014, as the Smocks claim, the suit was timely under either statute of limitations.
Cooperative argues that, if it has an obligation to pay damages under the terms of the easement, that obligation arises "when and if such damage occurs" and, thus, the Smocks' cause of action accrued at the time the damage occurred and was ascertainable, rather than when the Smocks' demand was rejected.[25] But, because the Smocks did not demand payment and Cooperative did not refuse until 2014, the Smocks assert that their contract claim did not accrue until that time. The Smocks contend that, until 2014, Cooperative had not breached its payment obligation, and therefore, they had no breach of contract claim, and that when their contract claim accrued in 2014, they timely filed suit.
Generally, in Missouri, a cause of action accrues and the statute of limitations begins to run when damage is sustained and ascertainable and when the right to sue thereon arises. Northern Farms, Inc. v. Jenkins , 472 S.W.3d 617, 626 (Mo. App. W.D. 2015) (quoting § 516.100) (A "cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment."); Vandenheuvel v. Sowell , 886 S.W.2d 100, 102-03 (Mo. App. W.D. 1994) ("[T]he requirement that damages be sustained and capable of ascertainment does not change the tenet that when an injury is complete as a legal injury, the period of limitations commences at once."); Loeffler v. City of O'Fallon , 71 S.W.3d 638, 642 (Mo. App. E.D. 2002) (citing Ballwin Plaza Corp. v. H.B. Deal Constr. Co. , 462 S.W.2d 687 (Mo. 1971) ) ("[T]he statute of limitations begins to run when the right to sue thereupon arises."). These general principles support Cooperative's argument that the Smocks' cause of action accrued, and thus the statute of limitations began to run, by the spring of 2005 because, by then, the alleged damage had occurred, the obligation to pay was triggered, the Smocks were aware of the damage, and they could have sought to enforce the obligation.
Because the easement has no language that requires a demand by the Smocks and a rejection by Cooperative before payment is due, the question is whether such a requirement can be read into the easement as a precondition on the Smocks' right to sue. In support of reading into the easement such a precondition to suit, the Smocks rely primarily on Spalding v. Stewart Title Guaranty Company , 463 S.W.3d 770 (Mo. banc 2015). In that case, the insured purchased a large tract of land in order to develop it, and he acquired title insurance on the property. Id. at 772. The insured learned of a potential title defect in January 2006 and promptly contacted the insured's agent. Id. at 773. From April 2006 until mid-June 2006, the insurer investigated the defective title claim and determined that the insured did not possess good title to the entire tract of land covered by the policy because the seller did not have title to one acre of the 419-acre piece of property. Id . On July 15, 2006, the insured made a claim under the policy. Id.
*227 The policy covered loss or damage sustained by reason of a defect in the title and delineated several different ways that the insurer could address a claim; the insurer elected to pay the difference between the value of the property as insured and the value of the property subject to the defect, as determined by an appraisal ($10,000). Id. at 772-74. Believing that he could not develop the property as planned without ownership of the one-acre parcel at issue, the insured asked the insurer to rectify the defect by purchasing the disputed property, but the insurer declined. Id. at 774-75. The insured filed suit on June 9, 2011, claiming breach of contract and vexatious refusal to pay under the insurance policy. Id. at 775. The insurer raised the statute of limitations as a defense. Id.
Relying on the fact that the claim was one for indemnification by an insurer, the Spalding court held that the 2007 date applied for purposes of the statute of limitations even though the insured learned of the possible title defect in 2006. Id. at 775-76. The court stated that "the claim for breach of contract did not accrue until [insurer] allegedly failed or refused to adequately compensate [insured] for 'the actual monetary loss or damage' as required under the title insurance policy." Id. at 776. The court explained that "[u]ntil [insurer] refused to adequately compensate [insured] for the damage, [insurer] had not breached the contract and [insured] had no claim for such a breach." Id. The court noted that the "mere existence of a possible title defect did not give rise to any cause of action against [insured]." Id.
Spalding is not a rejection of the general standard for determining when a contractual claim accrues; instead, the Spalding court simply applied that standard to the contract at issue. We decline to extend its holding to the facts of the present case for several reasons. First, Spalding involved the obligation to indemnify under a title insurance policy. The Spalding court rejected the insurer's claim that "the mere existence of a possible title defect" triggered accrual "in light of the terms of th[e] title insurance policy and the particular facts of th[e] case." Id. at 776. In so holding, the court stated, "[t]he title insurance policy at issue in this case did not guarantee [insurer] good title or protect [it] against potential claims. Rather, the policy indemnified [insurer] against 'actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of the matter insured against by the policy.' " Id. And, under the terms of the policy, the insurer's election to pay the loss rather than cure the defect resulted in the statute of limitations beginning to run because that is when the insurer failed to adequately compensate the insured for "the actual monetary loss or damage." Id. at 777. The Spalding court noted with approval a Maryland Court of Appeals opinion involving the same policy language. Id. The Maryland court held, "The contractual language is consistent with the position that a title insurance policy is breached only after notice of an alleged defect in title is tendered to the insurer and the insurer fails to cure the defect or obtain title within a reasonable time thereafter." Id. (quoting Stewart Title Guar. Co. v. West , 110 Md.App. 114, 676 A.2d 953, 962 (Md. Ct. App. 1996) ).
The Spalding holding makes sense, as insurance policies generally require an insured to make a claim with the insurer in order to trigger the insurer's obligations. In contrast, assuming the Smocks have a contract claim-a finding we do not make-their claim accrued when the damage occurred and was ascertainable, rather than when payment was denied. Cooperative agreed to pay "when and if such damage occurred," and thus the Smocks' claim accrued when they discovered the damage *228 in 2005 because that is when they "could first [have] maintain[ed] the action successfully." Modern Tractor , 863 S.W.2d at 952.
In addition, unlike the insured in Spalding , who acted promptly upon learning of the potential title defect, the Smocks waited nine years after they discovered the damage in 2005 to contact Cooperative in 2014 and demand payment. To interpret accrual as the Smocks suggest would allow them to postpone accrual of their contract claim indefinitely by delaying their demand for payment. That would undermine the purpose of statutes of limitations, which is to require claimants "to seasonably file and to vigilantly prosecute ... claims for relief" while evidence and witnesses remain available. Dorris v. State , 360 S.W.3d 260, 269 (Mo. banc 2012) (quoting State ex rel. Collector of Revenue of City of St. Louis v. Robertson , 417 S.W.2d 699, 701 (Mo. App. 1967) ). Allowing a party to control the running of the statute of limitations has generally been disfavored in Missouri. "The possibility of control of the statute of limitations by parties has been considered by Missouri courts in interpreting § 516.100 so as to avoid that possibility because such control would destroy the value of the statute of limitations as a statute of repose." Id. (citing M & D Enters., Inc. v. Wolff , 923 S.W.2d 389, 398-99 (Mo. App. S.D. 1996) ). Further, under the facts of this case, to allow the delay would not only undercut the purpose of the statute of limitations but also place an unreasonable burden on Cooperative. Although the Smocks were aware of the erosion, the delay allowed the extent of the damage to increase considerably.[26]
Point IV is denied.
Conclusion
The motion court properly determined that all causes of action asserted in the Second Amended Petition are barred by the applicable statutes of limitations. Accordingly, we affirm the motion court's grant of summary judgment on all counts.
Victor C. Howard, Judge, and George E. Wolf, Special Judge, concur.

On appeal from summary judgment, we review the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp. , 854 S.W.2d 371, 376 (Mo. banc 1993).

Title to the Smock farm is currently held by William and Jeanette's son, Robert, through the Robert C. Smock Revocable Living Trust; Robert's son, Travis, and his wife, through T & K Smock, LLC; and Joshua and his wife, Jessie. For ease of reference, we refer to the individual appellants by their first names, but in doing so, we mean no disrespect.

All provisions of the easement agreement run with the land and are binding on the parties, their heirs, and successors; Robert, Travis, and Joshua are heirs and successors of William and Jeanette.

In response to Cooperative's statement of uncontroverted facts, the Smocks asserted an additional material fact that "[t]he damage started in 2005," citing their own deposition testimony in support.

All evidence in the record indicates that the Smocks were aware of the erosion by the spring of 2005; there is no evidence in the record that the Smocks first learned of the damage at a later date. Thus, there is no genuine dispute as to when the Smocks became aware of the damage.

The Smocks' initial Petition is not part of the legal file in this case.

All statutory references are to the Revised Statutes of Missouri (2017), unless otherwise noted.

The Smocks sought leave to file a Second Amended Petition to add an injunctive relief count. The court granted the Smocks' motion, but did not require Cooperative to amend its summary judgment motion, which was originally directed to the Smocks' First Amended Petition, because the court determined that the claims in the Second Amended Petition were essentially identical to those in the First Amended Petition. Accordingly, the court considered the summary judgment motion to be directed to the Second Amended Petition.

"Even though not raised by the parties, an appellate court is obliged to notice, sua sponte, matters preventing it from obtaining jurisdiction." Boatright v. Boatright , 91 S.W.3d 753, 753 (Mo. App. S.D. 2002) (quoting Williams v. Westrip , 917 S.W.2d 590, 591 (Mo. App. S.D. 1996) ). A final judgment is a prerequisite to appellate review. Id. at 753-54. Missouri Supreme Court Rule 74.01(a) provides, in relevant part, "[a] judgment is entered when a writing signed by the judge and denominated 'judgment' or 'decree' is filed. The judgment may be a separate document or entry on the docket sheet of the case." In explaining the "denomination" requirement under Rule 74.01(a), the Missouri Supreme Court stated, "[w]hether the designation 'judgment' appears as a heading at the top of the writing, within the body of the writing in some manner, or in the entry on the docket sheet, it must be clear from the writing that the document or entry is being 'called' a judgment by the trial court." City of St. Louis v. Hughes , 950 S.W.2d 850, 853 (Mo. banc 1997). Although the order in the present case was not denominated "Judgment," the order stated, in pertinent part, "it is hereby ordered, adjudged and decreed that Summary Judgment be and is entered in favor of Defendant and against Plaintiffs in this cause on all claims set forth in Plaintiff[s'] Second Amended Petition...." The judge's docket entry also stated, "Summary Judgment be and is entered." The Southern District of this court previously held that a docket entry sustaining a motion for summary judgment was properly denominated a judgment under Rule 74.01(a) where the entry recited that the motion for summary judgment was sustained and further stated that "Summary Judgment entered accordingly." M & H Enters. v. Tri-State Delta Chems., Inc. , 35 S.W.3d 899, 901-02 (Mo. App. S.D. 2001) (finding docket entry was sufficiently denominated a judgment because the trial court "called" the text of its entry a "judgment."). Based on M & H Enterprises , we find the order in the present case to be a final judgment under Rule 74.01(a), and thus, we have appellate jurisdiction.

All rule references are to the Missouri Supreme Court Rules (2017), unless otherwise noted.

Count III of the Second Amended Petition purports to state a claim for violation of § 537.340, and Count IV purports to state a claim for inverse condemnation. None of the four points relied on challenges the motion court's award of summary judgment on these claims. An issue not presented in a point relied on is not preserved for review. Lusher v. Gerald Harris Constr., Inc. , 993 S.W.2d 537, 544 (Mo. App. W.D. 1999).

In his deposition, Robert testified that his parents, William and Jeanette, still owned the Smock farm in 2005. The Smocks have not offered evidence as to when they acquired the property, nor do they claim that, because they did not yet own the property in 2005, accrual of the limitations periods on their claims was thereby delayed. Therefore, we do not consider that issue on appeal.

See also Modern Tractor & Supply Co. v. Leo Journagan Constr. Co., Inc. , 863 S.W.2d 949, 954 (Mo. App. S.D. 1993) (unauthorized presence of fill dirt on plaintiff's property did not constitute continuing trespass).

The Smocks misinterpret Cooperative's argument. According to the Smocks, Cooperative argues that, because the easement agreement gave Cooperative the right to remove trees and brush within the easement boundaries, any damage resulting therefrom is within the scope of the easement agreement. But, Cooperative does not argue that the damage is within the scope of the easement. Instead, Cooperative argues that any claims must be pursued within the applicable limitations period.

The Smocks do not cite any authority for their proposition that "a continuing trespass occurs when the holder of an easement exceeds the scope of the easement they are granted." Appellants' Brief, p. 23.

Cooperative bargained for and received the unconditional right to remove all trees and brush within the 150-foot-wide easement. Contrary to the Smocks' interpretation, the provision in the easement agreement requiring Cooperative to first opine that trees pose a danger to the operation or maintenance of the power line before removing them applies to trees only outside of the easement.

Cooperative also argues that, because there is no competent evidence in the record that the erosion can be repaired and prevented, the Smocks failed to establish the "capable of being terminated" component of a continuing trespass. Because we find no continuing wrong, we need not address the "capable of being terminated" component of the continuing-wrong exception.

Despite referencing their negligence claim in their second point relied on, the error alleged in the Smocks' second point pertains to their temporary nuisance claim only. An issue not presented in a point relied on is not preserved for review. Lusher , 993 S.W.2d at 544. And to the extent they mention negligence in the discussion of their second point, it is as a basis for their temporary nuisance claim. Accordingly, our discussion of the Smocks' second point relied on is limited to their temporary nuisance claim.

An action for a temporary, abatable nuisance is governed by a ten-year statute of limitations. § 516.010; see Campbell v. Anderson , 866 S.W.2d 139, 143 (Mo. App. W.D. 1993) (An action for temporary nuisance is barred if it is "not filed within ten years from the last successive invasion of interest."). A claim for permanent nuisance is subject to a five-year limitations period. § 516.120.

The Smocks assert, without citation to legal authority, that Cooperative failed to attack the sufficiency of their temporary nuisance claims and that, therefore, "the continuing[-]wrong exception automatically applies." Appellants' Brief, p. 30. This assertion misses the point of Cooperative's summary judgment motion, which is based on expiration of the applicable statutes of limitations. In support of its motion for summary judgment, Cooperative presented uncontroverted facts regarding the terms of the easement, the removal of trees and brush, and the timing and nature of the erosion on the Smocks' property. In other words, all facts necessary to address the Smocks' claim of a temporary nuisance were presented. In addition, Cooperative made its legal arguments challenging the Smocks' temporary nuisance claim in its legal suggestions in support of its motion for summary judgment.

As noted above, the statutes of limitations for trespass and temporary nuisance are five and ten years, respectively. §§ 516.120(3) and 516.010. The limitations period for negligence is five years. § 516.120(4).

The Smocks cite two additional cases in support of their claim that an easement holder's failure to repair or maintain its easement is a continuing wrong, but those cases are distinguishable and, as a result, do not support the Smocks' position. Lake St. Louis Community Association v. Oak Bluff Preserve , 956 S.W.2d 305 (Mo. App. E.D. 1997) involved an alleged breach of a licensing agreement that obligated the property owners' association to maintain a marina. The court concluded that the association's alleged failure to maintain the marina triggered the continuing-wrong exception, and the defendant could pursue its counterclaim for damages. Id. at 310. Unlike the Smocks' claim of an obligation created by common law, Lake St. Louis involved a breach of the terms of a licensing agreement. Twin Chimneys Homeowners' Association v. J.E. Jones Construction Company , 168 S.W.3d 488, 499-501 (Mo. App. E.D. 2005) is also distinguishable because the failure to maintain in that case arose from a fiduciary duty, which is not present in this case.

In relevant part, § 516.110(1) provides, "[a]n action upon any writing ... for the payment of money" must be brought within ten years.

In pertinent part, § 516.120 states, "[a]ll actions upon contracts ... except those mentioned in section 516.110, ..." must be brought within five years.

The parties also dispute the scope of Cooperative's contractual obligation to pay additional sums, but because the only issue before us is the affirmative defense of statute of limitations, we do not address the parties' respective arguments about Cooperative's payment obligation.

Alternatively, the Smocks argue that the continuing-wrong exception applies to their contract claim. While that exception can apply to a contract claim, Davis v. Laclede Gas Co. , 603 S.W.2d 554, 556 (Mo. banc 1980), the exception does not save the Smocks' contract claim for the reasons articulated above.