

# SUPREME COURT OF MISSOURI
## en banc

RANDY SPALDING,          )
                                        )
               Respondent,    )
                                         )
       v.                  )       No. SC94580
                                         )
STEWART TITLE GUARANTY  )
COMPANY,               )
                                         )
              Appellant.     )

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
The Honorable Michael W. Manners, Judge

*Opinion issued May 12, 2015*

### Introduction

Stewart Title Guaranty Company appeals the circuit court's judgment in favor of Randy Spalding after a jury trial on his claims for breach of contract and vexatious refusal to pay in regard to a title insurance policy. Stewart Title contends that the circuit court erred in: (1) overruling its motions for directed verdict and judgment notwithstanding the verdict because the suit on the title insurance policy was time barred under the five-year statute of limitations for breach of contract; (2) refusing to give its proposed instruction concerning its statute of limitations defense; (3) overruling its motions for directed verdict and judgment notwithstanding the verdict because Spalding failed to make a submissible case as to the existence and amount of the damages for the breach of contract; (4) admitting evidence from appraiser Brian Reardon regarding the damages sustained

from the title defect under the policy; and (5) giving Instruction No. 7, regarding the measure of damages. Further, Stewart Title asserts that, if this Court reverses the circuit court's judgment regarding the breach of contract claim, then the circuit court necessarily erred in failing to sustain Stewart Title's motions for directed verdict, judgment notwithstanding the verdict, or new trial on the vexatious refusal to pay claim. The Court affirms.

## Facts and Procedural Background

Viewing the evidence in the light most favorable to the judgment, Spalding established that, in 2003, he contracted to buy approximately 419 acres of property in the City of Lake Winnebago in Cass County, Missouri. The land was bound by 167th Street, the existing Lake Winnebago Dam, and Missouri Route 291, and much of the land is in a federally-designated flood area. Spalding and his wife formed an entity named Spalding Land Company (SLC) to take title to the property in February 2003. The land was in receivership at the time of the acquisition, and SLC acquired the land for $1,510,000.

Stewart Title issued a policy of title insurance to SLC on February 12, 2003, in the amount of $1.7 million, insuring the property as described in Schedule A of the policy. Pursuant to the policy, Stewart Title insured against loss or damage sustained or incurred by SLC by reason of "[t]itle to the estate or interest described in Schedule A being vested other than as stated therein;" "[a]ny defect in or lien or encumbrance on the title;" "[u]nmarketability of the title;" and "[l]ack of a right of access to and from the land." The policy stated that it was "a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant" with liability not to exceed the lesser of

"(i) the Amount of Insurance stated in Schedule A; or, (ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy."

After purchasing the land, Spalding began talking with various people about developing the land. In 2005, Matt Bowen, John Bowen, and Scott Westlake created a new company named South Winnebago Partners (SWP). SWP began working with Spalding and SLC on plans for developing the property. The parties developed a plan to expand the existing Lake Winnebago into the flood area on the property to create new lake-front lots and traditional lots with lake-access rights.[1] In 2007, pursuant to an amended and restated operating agreement, SWP became one of the two members of SLC, along with Spalding. SWP also became the manager of SLC. The agreement recognized that the property was Spalding's contribution to SLC and that "services" were SWP's contribution to SLC.

SLC sought (and eventually obtained) a permit from the United States Army Corps of Engineers to partially remove the existing dam, construct a new dam and spillway, and expand Lake Winnebago. SLC also contracted with HNTB to be the land planner and with Olsson and Associates to perform engineering work. Further, SWP acquired options to purchase on surrounding parcels of land that might be needed for the project. Moreover, SLC presented its plan to the Lake Winnebago Homeowners Association and the city of Lake Winnebago, and both entities supported the plan.

---

[1] SLC had two different plans for development of the property. The 2006 plan called for development of between 354 and 365 lots. The 2007 plan called for the development of 154 lake-front lots and 231 traditional lots with lake-access rights.

3

Things appeared to be progressing with the development plan until January 2006 when Spalding received a telephone call from Paul Estes. Estes claimed that he owned a one-acre tract of land at the bottom of the lake proposed by SLC. Realizing that Estes's claim could preclude the development of the lake, Spalding contacted Coffelt Title, the agent for Stewart Title that had issued the title insurance policy to SLC. Coffelt Title responded with a letter to Spalding, dated March 21, 2006, acknowledging Spalding's claim and advising Spalding to contact Stewart Title regarding his claim.

As it turned out, both SLC and Estes held deeds showing that they owned this one-acre tract of land. Both SLC and Estes had purchased title insurance from Stewart Title, and both Estes and Spalding contacted Stewart Title about a possible title defect. From April 2006 until mid-June 2006, Stewart Title conducted an investigation to determine whether SLC or Estes possessed good title to the one-acre tract of land. On June 16, 2006, Stewart Title completed its investigation and determined that Estes owned the one-acre tract and that SLC did not. On July 15, 2006, Spalding contacted Stewart Title, and SLC made a claim under the title insurance policy.

After discovering that SLC's title was defective, Stewart Title made an election under paragraph 6 of the policy and chose to pay the loss suffered by SLC as a result of the defect. Paragraph 6 provides:

**6. OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**

In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.

4

. . . .

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant

(i) to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay; or

(ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant which were authorized by the Company up to the time of payment and which the Company is obligated to pay.

Upon the exercise by the Company of either of the options provided for in paragraphs (b)(i) or (ii), the Company's obligations to the insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

Stewart Title informed SLC that "[t]he loss under the policy is measured as the 'difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.'" Stewart Title, therefore, claimed that SLC's loss "would be the difference in value between the property with the 1 acre tract owned by Estes and the value of the property without that 1 acre tract." Stewart Title told SLC that it would commission an appraisal to determine this difference.

On July 3, 2007, Stewart Title sent a letter to SLC's counsel indicating that it completed its appraisal and that such appraisal "measured the diminution in value at $10,000." Along with its letter, Stewart Title enclosed a check in the amount of $10,000 to fully resolve the claim.

5

On July 12, 2007, SLC returned Stewart Title's check and informed Stewart Title that $10,000 did not adequately compensate SLC for its loss. The letter said:

> [W]e do believe that my client's loss is the difference in value of the land as insured, including the one (1) acre at issue, and the value of the land excluding the one (1) acre. Without the one (1) acre which is in question, the proposed Lake expansion cannot go forward, and Spalding Land Company LLC will suffer loss in the value of its land far greater than the amount of the insurance policy. With the defect corrected, and the one (1) acre in question included in the Spalding Land Company LLC tract, there would not be a loss to Spalding Land Company LLC. We do not believe that the appraisal provided accurately values the property with and without that one (1) acre.

SLC continued to suggest that, in lieu of paying the loss suffered by SLC as a result of its defective title, Stewart Title purchase the one-acre tract from Estes. Estes had requested payment of $387,000. To facilitate this approach, Spalding purchased and repeatedly renewed an option to purchase the tract from Estes. However, Stewart Title continued to insist that SLC's loss was only $10,000.

With the dispute unresolved with Stewart Title, SLC ceased operations and assigned this claim along with the land in question to Spalding. On June 9, 2011, Spalding filed suit against Stewart Title asserting claims for breach of contract and vexatious refusal to pay in regard to a title insurance policy. After a jury trial, the circuit court entered an amended judgment for Spalding in the amount of $1,100,000 on the policy, penalties in the amount of $110,150, and attorney fees in the amount of $81,000. Stewart Title appeals.

Stewart Title contends that the circuit court erred in overruling its motions for directed verdict and judgment notwithstanding the verdict because the suit on the title insurance policy was time barred under the five-year statute of limitations for breach of contract. Stewart Title asserts that the title insurance policy is a contract of indemnity that

6

contains no unconditional promise to pay as required to bring this case within the 10-year statute of limitations.

The running of the applicable statute of limitations is an affirmative defense. The party asserting the affirmative defense of the running of the applicable statute of limitations bears the burden of not only pleading it, but also proving it as a matter of law. *Powel v. Chaminade College Preparatory, Inc.*, 197 S.W.3d 576, 580 (Mo. banc 2006); *see also* Rule 55.08. "Thus, unless the party asserting the affirmative defense of the running of the statute of limitations proves its defense, as a matter of law, the trial court does not err in denying that party's motion's for directed verdict" or judgment notwithstanding the verdict. *Townsend v. Eastern Chemical Waste Systems*, 234 S.W.3d 452 (Mo. App. 2007).

**A Cause of Action for Breach of Contract Does Not Accrue Until a Breach of the Contract Occurs[2]**

---

[2] Stewart Title asserts that, pursuant to section 516.120(1) "[a]ll actions upon contracts, obligation or liabilities" must be brought within five years. If, however, the action is upon any writing for the payment of money, the action must be commenced within 10 years. §516.110(1). Stewart Title contends that the five-year statute of limitations under section 516.120(1) applies in this case because the title insurance policy at issue is a contract of indemnity that contains no unconditional promise to pay as required to invoke the 10-year statute of limitations.

Spalding contends the 10-year statute of limitations applies. He argues that his claim under this title insurance policy fits into the §516.110(1) exception that only applies to "actions upon a written contract . . . for the payment of money or property." It is true that some claims made against insurance policies are written contracts for the payment of money and, therefore, the 10-year statute of limitations applies. *See Johnson v. State Mut. Life Assurance. Co. of Am.*, 942 F.2d 1260, 1263 (8th Cir. 1991) (interpreting §§ 516.120(1) and 516.110(1)); *Brown v. CRST Malone, Inc.*, No. 4:11CV1527, 2012 WL 4711450 (E.D. Mo. 2012). The particular terms of each contract (policy of insurance in this context) must be examined in accord with this Court's analysis set out in *Rolwing v. Nestle Holdings, Inc.*, 437 S.W.3d 180, 182-83 (Mo banc 2014), to determine which statute of limitations applies. None of the cases relied on by Spalding involved a title insurance policy or terms similar to the policy at issue in this case that provided the insurance company with the option to comply with its coverage obligations by electing remedies that were other than the payment of money. It is assumed for purposes of resolving this case that the five-year statute of limitations applies.

Once Stewart Title determined that SLC's title was defective, it acted consistently with its contractual obligations. It made an election to pay SLC for its "actual monetary loss or damage." This was Stewart Title's right under the policy. It was not until July 3, 2007, when Stewart Title sent a letter to SLC's counsel indicating that it completed its appraisal of the property and included a check for $10,000 to fully resolve the claim under the title insurance policy that Spalding's claim for breach of contract occurred. Stated differently, the claim for breach of contract did not accrue until Stewart Title allegedly failed or refused to adequately compensate SLC for "the actual monetary loss or damage" as required under the title insurance policy.

Section 516.100[3] provides:

> Civil actions, other than those for the recovery of real property, can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued; provided, that for the purposes of sections 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

Until Stewart Title refused to adequately compensate SLC for the damage, Stewart Title had not breached the contract and SLC had no claim for such a breach. Spalding filed his petition with the circuit court asserting its claim against Stewart Title for breach of contract on June 9, 2011. Therefore, Spalding's claims were timely because suit was filed fewer than five years after Stewart Title's letter of July 3, 2007.

---

[3] All statutory citations are to RSMo 2000.

Stewart Title argues that the statute of limitation began to run at the moment SLC learned of the possible title defect because that is when damages were capable of ascertainment. However, in light of the term of this title insurance policy and the particular facts of this case, the mere existence of a possible title defect did not give rise to any cause of action against Stewart Title. The title insurance policy at issue in this case did not guarantee SLC good title or protect SLC against potential claims. Rather, the policy indemnified SLC against "actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of the matter insured against by the policy."

Stewart Title has even recognized that the mere presence of a title defect does not establish a breach of its title insurance policy. Reviewing this Stewart Title insurance policy the Maryland court of appeals held, "The contractual language is consistent with the position that a title insurance policy is breached only *after* notice of an alleged defect in title is tendered to the insurer and the insurer fails to cure the defect or obtain title within a reasonable time thereafter." *Stewart Title Guar. Co. v. West*, *676 A.2d 953*, 962 (Md. App. 1996) (internal citations and quotations omitted). In this case Stewart Title, after investigation, selected its other option, which was to pay for the actual monetary loss.

Although SLC was put on notice in early 2006 about Estes's possible ownership claim to the one-acre tract of land, it took until June 16, 2006, for Stewart Title to complete its investigation and determine that an actual defect existed with SLC's title to the property. Until that determination was made, SLC did not suffer an "actual monetary loss or

9

damage" and could not seek indemnification from Stewart Title.[4] In a case involving a contract of indemnity against loss, the claim accrues when the indemnitee sustains actual loss. *Burns & McDonnell Eng'g Co., v. Torson Const*. Co.*, 834 S.W.2d 755, 758 (Mo. App. 1992). Therefore, the earliest that damages could have possibly been ascertained was on June 16, 2006. Until that date, SLC did not sustain any actual loss that would trigger Stewart Title's duty to indemnify. But, as previously stated, Stewart Title did not breach its contract with SLC until July 3, 2007, when it allegedly failed and refused to adequately compensate SLC for the "actual monetary loss or damage" as required under the policy. Spalding filed his petition with the circuit court asserting its claim against Stewart Title for breach of contract on June 9, 2011.

To the extent that Stewart Title asserts that the circuit court erred in refusing to give Stewart Title's proposed instruction to the jury concerning its statute of limitations defense, this assertion is without merit. Stewart Title argues that the evidence supported the submission of the instruction in that the jury could have reasonably found that the injury and substantial damages were capable of ascertainment more than five years prior to the suit when SLC learned of Estes's title defect in January 2006. As explained above, even assuming the five-year statute of limitations applies, as a matter of law it did not begin to run when Spalding became aware of the possible title defect. Rather, under the terms of this insurance policy, Stewart Title's election to pay the loss rather than cure the defect

---

[4] Stewart Title relies on *Hopmeirer v. First Am. Title Ins. Co.*, 856 S.W.2d 387, 388 (Mo. App. 1993), in support of its contention that the statute of limitations began to run once Spalding and SLC were on notice of the potential title defect. In *Hopmeirer*, the title insurance policy at issue guaranteed the policyholder good title. Accordingly, the policy was breached when the policyholder discovered that he did not possess good title. In this case, the breach of contract did not occur until Stewart Title failed to pay the "actual monetary loss or damage."

10

results in the statute of limitations beginning to run when Stewart Title failed or refused to adequately compensate Spalding for "the actual monetary loss or damage." Stewart Title did not breach its contract with SLC—and, therefore, Spalding could not sue Stewart Title for that breach—until July 3, 2007. Because Spalding filed suit on June 9, 2011, well within the statute of limitations Stewart Title argues applies (i.e., the five-year statute), the circuit court did not err in refusing to submit Stewart Title's instruction regarding its statute of limitations defense.[5]

### Expert Testimony

Stewart complains about the insufficiencies of the testimony of Spalding's appraiser in regard to damages. Stewart Title asserts that the circuit court erred in overruling its motions for directed verdict and judgment notwithstanding the verdict because Spalding failed to make a submissible case as to the existence and amount of the claimed damage for breach of contract. Stewart Title argues that Spalding's only evidence of damages came from his appraiser, Brian Reardon, and contends that the circuit court should have granted its motions for directed verdict and judgment notwithstanding the verdict because: (1) Reardon's appraisal was based on a lake development plan that Spalding and SLC had abandoned; (2) Reardon's appraisal was based on a plan that included uninsured parcels of land that were never owned by SLC or Spalding; and (3) Reardon provided no basis for a rational and non-speculative estimate of damage arising from the title defect under the policy. In another point on appeal, Stewart Title asserts that the circuit court erred in admitting the testimony from Reardon regarding damages because his testimony was

---

[5] "Whether a jury was properly instructed is a question of law this Court reviews de novo." *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010).

11

inadmissible as speculative, unreliable, and unsupported by the facts because it was based on assumptions contrary to the facts in evidence, including "the existence of a governmental permit to create a lake development, title insurance coverage and ownership of all required property, and the availability of financing."

These issues will be analyzed collectively. Section 490.065 governs the admission and exclusion of expert testimony and has four requirements: 1) the expert witness must be qualified; 2) the testimony will assist the trier of fact; 3) the expert's testimony is based on facts or data of a type reasonably relied on by other experts in the field; and 4) the facts or data used by the expert are otherwise reasonably reliable. This Court reviews a circuit court's decision to admit or exclude expert testimony for an abuse of discretion. *Kivland v. Columbia Orthopaedic Grp. LLP*, 331 S.W.3d 299, 311 (Mo. banc 2011); s*ee also* section 490.065. But, "this Court reviews the interpretation of the statute *de novo*." *Kivland*, 331 S.W.3d at 311.

"The standard of review for the denial of a judgment notwithstanding the verdict (JNOV) is essentially the same as review of the denial of a motion for directed verdict." *All Am. Painting, LLC v. Fin. Solutions & Associates, Inc.*, 315 S.W.3d 719, 723 (Mo. banc 2010).

> When reviewing a circuit court's denial of a judgment notwithstanding the verdict, [t]his Court must determine whether the plaintiff presented a submissible case by offering evidence to support every element necessary for liability. Evidence is viewed in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences. This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion.

12

*Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 630 (Mo. banc 2013) (internal citations and quotations omitted).

Spalding presented evidence of damages through Brian Reardon, a licensed appraiser with Bliss & Associates. Reardon conducted an appraisal of the land at issue and determined that the estimate of damages as of February 15, 2007, was:

| | |
|---|---|
| Insured Property | $5,700,000 |
| Insured Property Subject to Defect | $1,600,000 |
| Damages | $4,100,000 |

This valuation stemmed from the proposed lake development that was in progress when the title defect was determined. Stewart Title asserts that, because Reardon reached his damage opinion by considering and valuing a 2007 lake development plan with 385 lots that included parcels never insured under the title insurance policy and never owned by Spalding or SLC, the evidence failed to provide a reasonable basis for a fact finder to determine what, if any, portion of Reardon's opinion establishes or quantifies damages attributable to the title defect in the insured property.

To the extent that Stewart Title contends that Reardon's damage estimates were based in part on the inclusion of uninsured and non-owned parcels of land in the 2007 lake development plan, such was an issue for the jury to weigh in considering Reardon's opinion valuating the property. Moreover, the jury heard evidence that SWP, SLC's manager, had acquired options to purchase these parcels of land and that SWP could have exercised its options if the development plan had gone forward. Further, Stewart Title cross-examined Reardon extensively about whether the inclusion of non-owned parcels of land would in any way change his appraisal, and Reardon acknowledged that it "could."

13

Reardon agreed that, if Spalding had to purchase property from others to construct his lake plan, it could change the costs in his appraisal report. Thus, Stewart Title pointed out the shortcomings in Reardon's testimony, and it was up to the jury to weigh Reardon's testimony.

Stewart Title also contends that, because Spalding testified at trial that he now intends to utilize a different lake development plan than the plan considered by Reardon, Reardon's valuation of damages based on the old development plan is no longer sufficient evidence of the damages suffered by Spalding as a result of the breach of the title insurance policy. In Reardon's appraisal, he assumed the lake development plan would have 154 "lake lots" and 231 "traditional lots," which was the plan that SLC was proceeding under at the time that Reardon made his appraisal. Although Spalding testified at trial that he now intended to develop the property under a plan that called for the development of 345 and 365 lots, the jury still had before it Reardon's testimony regarding his appraisal of the land as a lake development plan under the plan that SLC was proceeding under at the time of the appraisal. Stewart Title had the opportunity and did cross-examine Reardon about whether his valuation would change if the lake development plan changed.

Stewart Title further contends that Reardon's opinion was based on assumptions contrary to the facts in evidence, including "the existence of a governmental permit to create a lake development, title insurance coverage and ownership of all required property, and the availability of financing." As of the effective date of Reardon's appraisal, numerous steps had been taken on the lake development plan. The plan had been

14

presented to the City of Lake Winnebago and the Lake Winnebago Homeowners Association, and those entities had expressed support for the development. Although Reardon testified at trial that he made the assumption that Spalding or SLC could have obtained a permit for the lake development plan, in the appraisal he specifically stated:

> The US Army Corps of Engineers issued a joint public notice with the Missouri Department of Natural Resources, Water Pollution Control Program in order to collect comments in deciding whether to grand [sic] Section 401 water quality certification. This public notice was issued on March 23, 2007, which is after the effective date of this report, but is tangible evidence that permitting process was well along as of the effective date.

Reardon acknowledged that he made the assumption that Spalding owned or had the right to buy the property shown in the development and that he based that assumption on what Spalding told him and upon legal descriptions of the property that were given to him. In addition, as noted previously, the evidence established that SWP, SLC's managing member, had acquired options to purchase the parcels surrounding the land that might be needed for development. Further, Reardon testified that it made no difference in his appraisal whether it was financially possible for Spalding or SLC to proceed with the lake development plan at the time of his appraisal because his market analysis established that the development plan was financially feasible. He explained that the land could have been sold to someone else to proceed with the development.

After review of the record in its entirety, the Court holds that the circuit court did not abuse its discretion in allowing any of this expert testimony. *See Kivland*, 331 S.W.3d at 311. As a general rule, "[a]ny weakness in the factual underpinnings of the expert's opinion . . . goes to the weight that testimony should be given and not its admissibility."

15

*Elliott v. State*, 215 S.W.3d 88, 95 (Mo. banc 2007) (internal citations and quotation marks omitted). All of these assumptions may have been weaknesses in the factual underpinnings of Reardon's opinion, but such weaknesses go to the weight of his testimony and not to its admissibility. Stewart Title had the opportunity to cross-examine Reardon extensively about his assumptions and did so, but the record establishes that Reardon's assumptions were not so speculative, unreliable, and unsupported by the evidence as to render his opinion inadmissible.

After review of the record in its entirety, Spalding presented sufficient evidence to support the jury's determination of damages for breach of contract. The circuit court, therefore, did not err in overruling Stewart Title's motions for directed verdict and judgment notwithstanding the verdict.

### Instruction No. 7 Properly Instructed the Measure of Damages

Stewart Title asserts that the circuit court erred in giving the jury Instruction No. 7 and in overruling its motion for new trial because the instruction erroneously defined the measure of damages in accordance with the highest and best use of the property under condemnation law rather than the benefit of the bargain under contract law. Stewart Title contends that, because the policy specified the applicable measure of damages as "actual monetary loss or damage" based on the property "as insured," it was improper to base damages on a nonexistent lake development.

"Instructional error is reviewed *de novo*." *Howard v. City of Kansas City*, 332 S.W.3d 772, 789 (Mo. banc 2011). This Court will only reverse a verdict for instructional

16

error "if the party claiming instructional error establishes that the instruction at issue misdirected, misled, or confused the jury, resulting in prejudicial error." *Id.* at 790.

Instruction No. 7 provided:

If you find in favor of Plaintiff, you must award Plaintiff such sum as you believe was the difference between the fair market value of the entire insured property at the time the title defect was discovered and the fair market value of the insured property subject to the title defect. In determining the fair market value of the property, you may consider evidence of the value of the property including the highest and best use to which the property reasonably may be applied or adapted, the value of the property if freely sold on the open market, and generally accepted appraisal practices. You may give such evidence the weight and credibility you believe are appropriate under the circumstances. If you find that Plaintiff failed to mitigate damages as submitted in Instruction No. 8, in determining Plaintiff's total damages you must not include those damages that would not have occurred without such failure.

The phrase "fair market value" as used in this instruction means the price that the insured property in question would bring when offered for sale by one willing but not obliged to sell it and when bought by one willing or desirous to purchase it but who is not compelled to do so.

The instruction is a modified version of MAI No. 9.02.[6]  Where, as here, no specific MAI instruction is directly applicable, "an MAI must be modified to fairly submit the issues in a particular case, or where there is no applicable MAI so that an instruction not in MAI must be given[.]"  Rule 70.02(b).  The instruction given or modified "shall be simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts."  *Id.*  In *Fohn v. Title Ins. Corp. of St. Louis,* this Court noted:

[I]n the area of eminent domain the pattern instruction to guide a jury in awarding damages (where part of property is taken) may be found in MAI-9.02.  It, in part, provides: "You must award . . . such sum as you believe is . . . the difference between the fair market value of . . . (the) whole

---

[6] MAI No. 9.02 is the approved damage instruction for eminent domain cases.

property immediately before the taking . . . and the value of . . . (the) remaining property immediately after such taking . . ." The "difference" thus found is accepted as the "loss" suffered by the owner of the land. The defendant has not suggested, nor has own research revealed any persuasive reason why the same approach shold [sic] not be applicable in this instance. Not only does it appear to be the most fair and accurate method, but its adoption in title insurance cases would contribute toward uniformity in the area of assessment of damages.

529 S.W.2d 1, 4 (Mo. banc 1975). The MAI No. 9.02 eminent domain instruction in effect

at the time the *Fohn* court issued its opinion provided:

> You must award defendant such sum as you believe is [was] the difference between the fair market value of defendant's whole property immediately before the taking [on (*insert date of appropriation*)] and the value of defendant's remaining property immediately after such taking, which difference in value is the direct result of the taking and of the uses which plaintiff has the right to make of the property taken.[7]

Stewart Title contends that the measure of damages used in condemnation cases

does not apply to cases involving a breach of title insurance policy. In *Fohn*, this Court

held that it was appropriate to modify the eminent domain damage instruction, MAI No.

9.02, to instruct the jury as to the measure of damages for a claim made against a title

---

[7] The 2012 Revision of MAI No. 9.02, which is the instruction that Spalding modified for Instruction No. 7, now provides:

> You must award defendant such sum as you believe [was] is the difference between the fair market value of the entire property [immediately before the taking on *(insert date of appropriation)*] and the fair market value of the remaining [burdened] property [immediately after the taking]. In determining the fair market value of defendant's property, you may consider evidence of the value of the property including [comparable sales, capitalization of income, replacement cost less depreciation,] the highest and best use to which the property reasonably may be applied or adapted, the value of the property if freely sold on the open market, and generally accepted appraisal practices. You may give such evidence the weight and credibility you believe are appropriate under the circumstances.

insurance policy.[8]  Stewart Title asserts, however, that the measure of damages developed for condemnation cases based on the highest and best use do not apply in this case in which the policy defines the measure of damages.  Pursuant to the terms of this policy, Stewart Title insured against loss or damage sustained or incurred by SLC by reason of "[t]itle to the estate or interest described in Schedule A being vested other than as stated therein;" "[a]ny defect in or lien or encumbrance on the title;" "[u]nmarketability of the title;" and "[l]ack of a right of access to and from the land."  The terms of this policy provided it was "a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant" with liability not to exceed the lesser of: "(i) the Amount of Insurance stated in Schedule A; or, (ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy."

Stewart Title argues that the title insurance policy contains express limitations on the measure of damage to the property "as insured" and a requirement of "actual monetary loss or damage."  Stewart Title further argues that the policy language prohibits consideration of the highest and best use of the insured property.  However, the "as insured" language that Stewart Title emphasizes refers to the condition of the title and not to the property's use.[9]  Stewart Title insured a fee simple estate in land having the legal description set forth in the policy's Schedule A.  Therefore, in the event that the policyholder is found to possess some lesser interest, the policyholder is entitled to

---

[8] Subsequently, the court of appeals, relying on *Fohn*, has affirmed the use of an instruction modified from MAI No. 9.02 in a breach of title insurance policy and vexatious refusal to pay. *Davis v. Stewart Title Guar. Co.*, 726 S.W.2d 839, 853 (Mo. App. 1987).

[9] The same policy could be used to insure a life estate or a long-term leasehold interest.

19

damages as measured by "the difference in the value of the insured estate or interest as insured [(i.e. fee simple in land having the legal description set forth in Schedule A)] and the value of the insured estate or interest subject to the defect." The policy is silent about how this valuation is to be performed. Appraisers for both parties at trial testified that their appraisals were based on the properties "highest and best use." No witness testified that Spalding's damages must be calculated based on the value of the property as it was being used at the time of the breach. To the extent that Stewart Title contends that the property "as insured" under the policy necessarily meant undeveloped property, as opposed to fully developed lake front property, its contention is without merit.

The jury was instructed that, if it found in favor of Spalding, it had to award "Plaintiff such sum as you believe was the difference between the fair market value of the entire insured property at the time the title defect was discovered and the fair market value of the insured property subject to the title defect." That, indeed, was the measure of damages. The instruction merely informed the jury that, in determining the fair market value of the property, the jury could consider "evidence of the value of the property including the highest and best use to which the property reasonably may be applied or adapted, the value of the property if freely sold on the open market, and generally accepted appraisal practices." While such language may very well be surplusage or better left to argument, it is nonetheless an accurate statement of the law and did not mislead or confuse the jury.

In this case, Spalding's expert testified the highest and best use of the property was the proposed lake development. Even Stewart Title's claim counsel acknowledged that

20

Stewart Title's appraiser considered the property's highest and best use as a mixed-use purpose with commercial and single-family residential. Based on the evidence presented, it was for the jury to determine fair market value, which was defined as "the price that the insured property in question would bring when offered for sale by one willing but not obliged to sell it and when bought by one willing or desirous to purchase it but who is not compelled to do so." In making its determination about fair market value, the instruction merely allowed the jury, but did not require it, to consider and weigh the evidence concerning the highest and best use of the property. The circuit court, therefore, did not err in giving the jury Instruction No. 7 and in overruling Stewart Title's motion for judgment notwithstanding the verdict and new trial.

The circuit court's judgment is affirmed.[10]

_____
Zel M. Fischer, Judge

All concur.

---

[10] Because of the court's disposition of the breach of contract claim, it is unnecessary to consider the additional request raised by Stewart Title that the vexatious refusal to pay judgment be reversed.