

# In the Missouri Court of Appeals
# Eastern District

**DIVISION ONE**

| | | |
|---|---|---|
| DEBBIE PYZYK, | ) | No. ED111709 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | Cause No. 1922-CC00398 |
| | ) | |
| GATEWAY PSYCHIATRIC GROUP, | ) | |
| LLC & GORDON ROBINSON, M.D., | ) | Honorable Clinton R. Wright |
| | ) | |
| Defendants/Appellants. | ) | Filed: June 11, 2024 |

**Introduction**

Gateway Psychiatric Group and Dr. Gordon Robinson (collectively, "Appellants") appeal the trial court's judgment in favor of plaintiff Debbie Pyzyk in a medical malpractice lawsuit following the death of Pyzyk's daughter, K.P. On appeal, Appellants argue the trial court erred in submitting a verdict directing instruction that improperly included inconsistent alternative theories of negligence, contained more than ultimate facts, and misdirected, misled, and confused the jury. Second, Appellants argue the trial court erred in admitting Plaintiff's expert's opinion testimony regarding K.P.'s cause of death because the testimony did not meet the requirements of Section 490.065. Third, Appellants argue the trial court erred in allowing the introduction of K.P.'s death certificate into evidence without limitation because the medical examiner's conclusion regarding

1

the cause of death was not based on personal knowledge. Finally, Appellants argue the trial court erred in allowing aggravating circumstances damages to be submitted to the jury because there was no evidence of intentional wrongdoing.  We affirm the judgment of the trial court.

## Factual and Procedural Background

*Facts*

Dr. Gordon Robinson is a psychiatrist who began treating K.P. on June 25, 2013. K.P. was admitted to Harris House Treatment and Recovery Center for inpatient treatment of alcohol dependence and Adderall abuse. Dr. Robinson continued treating K.P. until her death on March 16, 2016. K.P. suffered from various health conditions, including alcohol dependence, ADHD, amphetamine abuse, generalized anxiety disorder, bulimia nervosa, and anorexia nervosa.

To treat her alcohol abuse, K.P. previously attended a rehabilitation program in California. At that time, K.P. was off Adderall, an amphetamine she had previously abused. Instead, K.P. took the non-addictive Strattera to treat her ADHD. K.P. returned to St. Louis where she relapsed with alcohol. After the relapse, K.P. was admitted to Harris House where she began receiving treatment from Dr. Robinson.

Dr. Robinson learned that K.P. abused Adderall in the past to continue drinking and to keep weight off, but K.P. was not on amphetamines when she came to Harris House. While treating K.P. at Harris House, Dr. Robinson prescribed Vyvanse (Lizdexamfetamine),[1] an amphetamine. Initially, Dr. Robinson prescribed one dose of 50 mg per day. Dr. Robinson changed the prescription to two doses of 50 mg (a total of 100 mg) per day because the effect of the Vyvanse was wearing off in the afternoon.

---

[1] This substance also is referred to interchangeably as "Lisdexamfetamine" in parts of the record.

2

Pursuant to FDA guidance, the maximum daily dosage of Vyvanse was 70 mg. The FDA provided a black box warning that Vyvanse was an amphetamine and had significant abuse liability, especially when given at a higher dose. On multiple occasions, Dr. Robinson prescribed Vyvanse to K.P. for months without seeing her. K.P was abusing the Vyvanse and taking more than the prescribed amount. At the height of her Vyvanse abuse, K.P. was taking more than two and a half pills per day, roughly equal to 135 mg, a potentially toxic level.

Following the increase in dosage, K.P. lost weight and developed a picking habit. K.P. picked out her entire eyebrow and had scabs she would not leave alone. Also, the change from a single daily dose to two doses caused problems with K.P.'s medical insurance. The insurance covered only one 30-day supply. K.P. had to pay for the second 30-day supply out of her own pocket. This became a source of tension between K.P. and her mother, Debbie Pyzyk, because neither had the money for the prescription.

One evening, K.P. and her mother got into an argument about paying for a Vyvanse prescription. K.P.'s mother did not want to pay for the prescription. K.P. was extremely agitated and screaming. About fifteen minutes after the argument ended, it got quiet. C.M., K.P.'s fiancé who was also at the house, went to K.P.'s bedroom and found her unresponsive on her bed.[2] Paramedics arrived and took K.P. to the hospital. A few days later, doctors declared K.P. brain dead. She was 35 years old.

Following K.P.'s death, the St. Louis County Medical Examiner's Office determined K.P.'s cause of death was an "intraventricular hemorrhage secondary to acute Lisdexamfetamine toxicity." This cause of death was listed on K.P.'s death certificate.

---

[2] The personal identifying information of witnesses has been omitted pursuant to RSMo § 509.520 (Supp. 2023).

*Procedural History*

Plaintiff Debbie Pyzyk filed a wrongful death lawsuit alleging that Dr. Robinson was negligent in treating K.P. The case proceeded to trial.

Motion to Strike F.D.'s Testimony

Prior to the start of trial, Appellants filed a motion to strike the testimony of Plaintiff's expert, F.D. Appellants argued F.D.'s testimony did not meet the requirements of Section 490.065.2 because F.D.'s "opinions are neither supported by sufficient facts or data, nor the product of reliable admissible principles or materials."[3] More specifically, Appellants alleged F.D. had never encountered or reviewed a case in which a person had a stroke and died from Vyvanse use. Plaintiff responded that F.D. used the presumptively admissible "differential diagnosis" methodology to conclude K.P.'s stroke and death were caused by Vyvanse.

On January 7, 2023 Appellants filed a renewed motion to strike the expert testimony of F.D. Appellants advanced the same arguments and further challenged the factual basis for F.D.'s opinion. Shortly before F.D.'s trial testimony, Appellants raised their renewed motion to the trial court. Following oral argument, the trial court denied the motion.

Admission of K.P.'s Death Certificate

The medical examiner's conclusions in K.P.'s death certificate first came up during the trial testimony of C.M., K.P.'s fiancé. Plaintiff's counsel specifically asked about the death certificate and elicited testimony that C.M. had heard the cause of K.P.'s death was a brain bleed due to Vyvanse use. Appellants did not object to the admission of this testimony.

Then, during Pyzyk's testimony, Plaintiff's counsel offered K.P.'s death certificate into evidence. Appellants objected and said the death certificate was not admissible because the

---

[3] Unless otherwise indicated, all statutory references are to RSMo (2000) as amended.

medical examiner lacked personal knowledge of K.P.'s cause of death. The trial court initially sustained the objection to the death certificate's admission. Thereafter, Plaintiff's counsel asked Pyzyk if she had seen K.P.'s death certificate. Counsel then elicited from Pyzyk that she "saw the words on the death certificate that said the cerebral hemorrhage was secondary to Lizdexamfetamine—meaning Vyvanse." This testimony was admitted without objection.

During a recess at the conclusion of Pyzyk's testimony, Appellants again objected to the admission of K.P.'s death certificate. Appellants argued the medical examiner "did not have any independent knowledge of the case. The cause of death is a conclusion on her part. It's an absence of her having had any . . . personal knowledge." In response, Plaintiff's counsel cited *Johnson v. Missouri Board of Nursing Administrators*, 130 S.W.3d 619 (Mo. App. W.D. 2004), for the proposition that "a certified copy of a death certificate is prima facie evidence of the facts stated therein and is generally admissible both to prove death and to offer some evidence as to the immediate cause of death." Plaintiff argued that K.P.'s death certificate was certified and thus admissible. On these grounds, the trial court admitted the death certificate.

Aggravating Circumstances

Shortly before trial, Appellants moved to strike Plaintiff's claim for aggravating circumstances damages for failure to allege sufficient facts to state a claim. Appellants argued that Plaintiff's claims amounted to only negligence and "there [was] simply no evidence of intentional wrongdoing."

After Appellants rested their case-in-chief, they orally raised their motion to strike the claim for aggravating circumstances damages. Appellants argued the testimony and exhibits did not demonstrate willful, wanton, or malicious conduct by Dr. Robinson when he prescribed Vyvanse to K.P. In response, Plaintiff argued that Dr. Robinson knew of K.P.'s prior amphetamine

and alcohol abuse and still prescribed Vyvanse to K.P. Plaintiff also argued that Dr. Robinson knowingly prescribed more than the maximum daily dosage of Vyvanse suggested by the FDA and that Vyvanse's manufacturer warned Dr. Robinson not to exceed the maximum daily dosage. Finally, Plaintiff pointed to Dr. Robinson's admission that he changed K.P.'s medical records a few years after she died.

The trial court denied Appellants' motion to strike and submitted aggravating circumstances damages to the jury. The jury rendered a verdict in favor of Plaintiff and awarded $5 million in compensatory damages, which the trial court reduced to $801,061 pursuant to the medical malpractice liability limitations in Section 538.210. Ultimately, the jury declined to award aggravating circumstances damages.

<u>Instruction 9</u>

At the instruction conference, Appellants proposed a verdict directing instruction regarding Dr. Robinson's alleged negligence to replace Instruction 9, the verdict directing instruction submitted by Plaintiff. Appellants argued that Instruction 9, as drafted, contained impermissible evidentiary detail instead of containing only ultimate facts for the jury's decision.

Instruction 9, as submitted by Plaintiff, permitted the jury to find Dr. Robinson negligent on any one of five disjunctive theories that he: (1) prescribed Vyvanse to K.P., or (2) prescribed Vyvanse above 70 mg per day, or (3) failed to weigh the risks and benefits of prescribing Vyvanse to K.P., or (4) failed to monitor K.P. for side effects, dependency, or addiction, or (5) failed to discontinue prescribing Vyvanse to K.P.

Appellants' proposed verdict directing instruction contained only the theory that Dr. Robinson "[u]nreasonably prescribed Vyvanse to K.P." Appellants argued the fact that Dr. Robinson unreasonably prescribed Vyvanse to K.P. should have been the only ultimate fact submitted to the jury. Appellants reasoned the remaining disjunctive facts in Instruction 9 were

6

encapsulated in the first fact, and thus were unnecessary evidentiary detail. Plaintiff argued each disjunctive theory in Instruction 9 was a different ultimate fact as to Dr. Robinson's negligence and was supported by substantial evidence. The trial court rejected Appellants' proposed instruction and submitted Instruction 9.

**Discussion**

Appellants raise four points on appeal. In their first point, Appellants argue the trial court erred in submitting Instruction 9 because the instruction improperly included inconsistent alternative theories of negligence, contained more than ultimate facts, and misdirected, misled, and confused the jury. In their second point, Appellants argue the trial court erred in admitting F.D.'s opinion testimony regarding K.P.'s cause of death because F.D.'s opinions did not meet the requirements of Section 490.065. In their third point, Appellants argue the trial court erred in allowing the introduction of K.P.'s death certificate into evidence without limitation because the medical examiner lacked personal knowledge of K.P.'s cause of death. In their fourth point, Appellants argue the trial court erred in submitting aggravating circumstances damages to the jury because there was no evidence of intentional wrongdoing.

<u>Point I</u>

In their first point, Appellants argue the trial court erred in submitting Instruction 9 because the instruction improperly included inconsistent alternative theories of negligence, contained more than ultimate facts, and misdirected, misled, and confused the jury.

*Preservation*

Plaintiff argues that Appellants failed to preserve a portion of Point I for appellate review. She argues that Appellants preserved only the argument that "the disjunctives contained unnecessary evidentiary detail" but did not preserve the issues of whether the instruction's disjunctives "misdirected, misled or confused the jury, lacked causation testimony, and permitted

7

a roving commission" because Appellants did not include those arguments in their motion for new trial.

"Rule 70.03 requires that counsel make specific objections to instructions considered erroneous." *Ross–Paige v. Saint Louis Metro. Police Dep't*, 492 S.W.3d 164, 170 (Mo. banc 2016). "This rule further instructs that '[n]o party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.'" *Id.* (quoting Rule 70.03).

At the instruction conference, Appellants did not object to the submission of Instruction 9. Rather, Appellants proposed an alternative instruction, which was denied. Because they did not object to the submission of Instruction 9, Appellants failed to preserve any claim of error. *See Acol v. Travers Autoplex & RV, Inc.*, 637 S.W.3d 415, 419 (Mo. App. E.D. 2021). Thus, we may review Appellants' claim for plain error only. *Id.*

*Standard of Review*

"Plain error review is discretionary with this Court and is rarely granted in civil cases." *Id.* (quoting *Declue v. Dir. of Revenue*, 361 S.W.3d 465, 467 (Mo. App. E.D. 2012)). "Our examination of the record must facially establish grounds for a belief that a manifest injustice has occurred." *Id.* "Parties are entitled to relief for plain error only when the error is outcome determinative." *Id.* (quoting *Declue*, 361 S.W.3d at 468).

*Analysis*

Ultimate facts are the facts a jury must find to return a verdict for the plaintiff. *Williams v. City of Kansas City*, 641 S.W.3d 302, 327 (Mo. App. W.D. 2021). "A proper instruction submits only the ultimate facts, not evidentiary details, to avoid undue emphasis of certain evidence, confusion, and the danger of favoring one party over another." *Newell Rubbermaid, Inc. v. Efficient*

8

*Sols., Inc.,* 252 S.W.3d 164, 174 (Mo. App. E.D. 2007) (quoting *Twin Chimneys Homeowners Ass'n v. J.E. Jones Const. Co.*, 168 S.W.3d 488, 497–98 (Mo. App. E.D. 2005)) (internal quotation marks omitted). "There are no precise, universally applicable definitions which explicitly differentiate evidentiary facts from ultimate facts." *Stalcup v. Orthotic & Prosthetic Lab, Inc.*, 989 S.W.2d 654, 658 (Mo. App. E.D. 1999) (quoting *Duncan v. First State Bank of Joplin*, 848 S.W.2d 566, 569 (Mo. App. S.D. 1993)) (internal quotation marks omitted). "A determination of the ultimate facts must be made on a case-by-case basis." *Newell Rubbermaid*, 252 S.W.3d at 174. "This determination involves analysis of the specific theory relied on by the party offering the instruction." *Stalcup*, 989 S.W.2d at 658.

"The ultimate fact is the act or omission (required to be stated by the expert) that constitutes negligence." *Ostrander v. O'Banion*, 152 S.W.3d 333, 339 (Mo. App. W.D. 2004). "How or why the physician committed or omitted the act is evidentiary detail not to be submitted unless the how or why would also constitute the ultimate fact or omission that is negligent." *Id.*

Appellants argue the sole ultimate fact for submission to the jury was that Dr. Robinson "prescribed Vyvanse to K.P." Appellants reason the four remaining disjunctives—that Dr. Robinson prescribed Vyvanse above 70mg per day; or failed to weigh the risks and benefits of prescribing Vyvanse to K.P.; or failed to monitor K.P. for side effects, dependency, or addiction; or failed to discontinue prescribing Vyvanse to K.P.—were encapsulated in the first disjunctive and thus were unnecessary evidentiary detail. Appellants maintain these remaining disjunctives are the "how or why" details prohibited by *Ostrander*.

Plaintiff responds that the first disjunctive advances a different theory of negligence than the others, and is not evidentiary detail. Plaintiff argues that the first disjunctive focuses on Dr. Robinson's negligent decision to prescribe Vyvanse to K.P. in the first instance. She points out

9

that, according to the trial testimony of Plaintiff's standard of care expert, K.P.'s "past history of amphetamine abuse, alcoholism and eating disorders made her not a candidate for an amphetamine to begin with."

The remaining four disjunctives in Instruction 9 focus on other theories of negligence after Dr. Robinson first prescribed Vyvanse to K.P. Plaintiff's standard of care expert identified as outside the standard of care Dr. Robinson's: prescription of Vyvanse in excess of the FDA's recommended dosage; failure to weigh the risks and benefits of prescribing Vyvanse to K.P.; failure to monitor K.P. for side effects, dependency, or addiction; and failure to discontinue prescribing Vyvanse after K.P. demonstrated signs of addiction and was taking more than she was prescribed. Plaintiff alleged that Dr. Robinson was negligent on each one of these grounds and that these were ultimate facts for the jury to decide. *Ostrander*, 152 S.W.3d at 339.

The five disjunctive theories submitted in Instruction 9 are ultimate facts in the circumstances presented here. *See Newell Rubbermaid*, 252 S.W.3d at 174–75. Accordingly, Appellants have failed to facially establish grounds for a belief that a manifest injustice has occurred, and we decline to review for plain error. *See Acol*, 637 S.W.3d at 419.

Point I is denied.

## Point II

In their second point, Appellants allege the trial court erred in allowing the jury to hear F.D.'s opinion testimony regarding K.P.'s cause of death. They argue F.D.'s testimony did not meet the requirements for admission into evidence pursuant to Section 490.065 in that it was not based upon his experience, not tested, and not supported by medical literature.

*Standard of Review*

We review the admission of expert testimony for an abuse of discretion. *Spalding v. Stewart Title Guar. Co.*, 463 S.W.3d 770, 778 (Mo. banc 2015). "The trial court abuses its discretion when it improperly includes or excludes expert testimony contrary to its findings regarding th[e] statutory elements." *Est. of Andress*, 624 S.W.3d 894, 901 (Mo. App. E.D. 2021); *see also Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 311 (Mo. banc 2011). "Expert testimony in civil cases is only admissible if it satisfies the evidentiary requirements of § 490.065." *Huett v. Branson*, 675 S.W.3d 514, 520 (Mo. App. E.D. 2023). "The burden is on the appellant to prove the trial court abused its discretion and prejudice resulted." *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 699 (Mo. App. E.D. 2020).

*Analysis*

Section 490.065.2 governs the admission of expert witness testimony. It provides, in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case[.]

Section 490.065.2; *see also Spalding*, 463 S.W.3d at 778.

Thus, under Section 490.065.2, "trial courts must act as gatekeepers to ensure that the testimony sought to be admitted . . . is 'not only relevant, but reliable.'" *Ingham*, 608 S.W.3d at 700 (quoting *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 317 (Mo. App. E.D. 2018); *Daubert*

11

*v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 589 (1993)).[4] If all four prerequisites are met, the trial court must admit the expert's testimony. *See Kivland*, 331 S.W.3d at 311. If all four prerequisites are not met, the expert testimony is inadmissible. *Huett*, 675 S.W.3d at 520.

Appellants argue F.D.'s opinion was not supported by sufficient facts or data. "In deciding whether the facts and data on which the expert relies are otherwise reasonably reliable, the circuit court 'independently assess[es] their reliability.'" *Kivland*, 331 S.W.3d at 311 (quoting *State Bd. of Registration for Healing Arts v. McDonagh*, 123 S.W.3d 146, 156 (Mo. banc 2003)).

While Appellants focus on certain facts or data not reviewed by F.D., the facts and data on which F.D. based his opinion included: K.P.'s death certificate stating that K.P.'s cause of death was an intraventricular hemorrhage secondary to, or as a result of, acute Lizdexamfetamine toxicity; the medical examiner's investigative report, which found the same cause of death and that the manner of death was an accident from the use of medication; Mercy Hospital records of K.P.'s hospitalization for the hemorrhagic stroke and positive drug screen for amphetamine; K.P.'s medical records from Dr. Robinson, including K.P.'s vital signs, weight of approximately 100 pounds, and normal blood pressure level; defense expert J.T.'s deposition; and medical literature regarding Vyvanse overdoses, strokes from Vyvanse use, and other side effects of Vyvanse. In addition to relying on these facts and data specific to this case, F.D. also relied on his training and experience as a board-certified forensic pathologist.

Appellants maintain that the facts and data on which F.D. relied were insufficient because he could offer no "physical evidence that K.P.'s cardiovascular system was adversely affected by

---

[4] Section 490.065.2(1)-(2) contains language identical to Federal Rules of Evidence 702 and 703, which federal courts interpret pursuant to *Daubert* and its progeny. Therefore, federal cases interpreting Rules 702 and 703 are relevant and useful in guiding our interpretation of Section 490.065.2. *Ingham*, 608 S.W.3d at 699–700.

her Vyvanse use to support his theory that chronic Vyvanse use caused her death." While the lack of any physical evidence of adverse effects on K.P.'s cardiovascular system is concerning, Plaintiff explains that F.D. applied the "differential diagnosis" methodology to determine K.P.'s death was caused by Vyvanse.

This Court previously has concluded that the differential diagnosis methodology of determining causation is presumptively admissible. *Ingham*, 608 S.W.3d at 709. Accordingly, the "court may exercise its gatekeeping function to exclude only those diagnoses that are scientifically invalid." *Id.* (quoting *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001)). "A medical opinion about causation, based upon a proper differential diagnosis, is sufficiently reliable to satisfy *Daubert*." *Id.* (quoting *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th Cir. 2000)). Thus, to be admissible, a differential diagnosis must be "scientifically valid" and "a proper" differential diagnosis. *Ingham*, 608 S.W.3d at 709.

"In performing a differential diagnosis, a[n expert] begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The [expert] then 'rules out' the least plausible causes of injury until the most likely cause remains." *Id.* (quoting *Glastetter*, 252 F.3d at 989) (alterations in original).[5] "The final result of a differential diagnosis is the expert's conclusion that a defendant's product caused (or did not cause) the plaintiff's injury." *Id.*

---

[5] The U.S. Court of Appeals for the Eighth Circuit also has variously described a differential diagnosis as one that "determines all of the *possible* causes for the patient's symptoms and then eliminates each of these potential causes until reaching one that cannot be ruled out," and in which "experts 'rule in' the *reasonably plausible* causes of an injury and then 'rule out' or eliminate them from least to more plausible until a most plausible cause emerges." *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 560 n.2 (8th Cir. 2014) (emphasis added). We think this Court's iteration in *Ingham*, 608 S.W.3d at 709, requiring the expert to identify all scientifically plausible causes, as opposed to all possible causes, is technically correct.

F.D. began his differential diagnosis by ruling in potential causes of hemorrhagic strokes: morbid obesity, kidney disease, other cardiovascular system conditions, malignant hypertension, diabetes, and amphetamine use. F.D. also noted that hemorrhagic strokes are not common for people at age 35. But F.D. never identified these potential causes as all the scientifically plausible causes of K.P.'s hemorrhagic stroke and death as required in the critical first step of a scientifically valid and proper differential diagnosis. *See Ingham*, 608 S.W.3d at 709 (quoting *Glastetter*, 252 F.3d at 989). F.D. nevertheless proceeded to rule out conditions K.P. obviously did not have, like morbid obesity, chronic kidney disease, cardiovascular conditions, malignant hypertension, and diabetes. Having ruled out those potential causes, F.D. settled on Vyvanse as the cause of K.P.'s hemorrhagic stroke and death.

The obvious problem with F.D.'s opinion, in addition to the lack of physical evidence of adverse effects of Vyvanse on K.P.'s cardiovascular system, is that neither the jury at trial nor we on appeal can know whether F.D. first identified all the scientifically plausible causes of K.P.'s death. This is particularly problematic given F.D.'s repeated testimony that K.P. "was only 35 and [had] no medical conditions," despite the uncontested evidence of K.P.'s history of various other conditions. Plaintiff bore the burden of presenting a scientifically valid and proper differential diagnosis and, on this record, she does not appear to have done so.

All of that said, even if F.D.'s differential diagnosis was thus unreliable and should not have been admitted, other substantial evidence at trial tended to prove that K.P.'s death was caused by Vyvanse use. This Court will not reverse a judgment unless the circuit court's error in admitting expert testimony "materially affected the merits of the action." *Huett*, 675 S.W.3d at 525; *Linton by and through Linton v. Carter*, 634 S.W.3d 623, 627 (Mo. banc 2021). In addition to F.D.'s testimony, Plaintiff also adduced K.P.'s death certificate listing K.P.'s cause of death as

14

"intraventricular hemorrhage secondary to acute Lisdexamfetamine toxicity;" the St. Louis County Medical Examiner's report finding the same cause of death in greater detail; the testimony of both Pyzyk and C.M., to which Appellants did not object, that K.P.'s cause of death was a brain bleed due to Vyvanse use; and the FDA approved Vyvanse packaging, warning: "<u>Serious Cardiovascular Risks</u>: . . . there is a serious cardiovascular risk including sudden death, myocardial infarction, stroke, and hypertension with VYVANSE use."

Finally, Appellants argue, pursuant to Section 490.065, that F.D.'s opinion was not the product of reliable principles and methods and that F.D. did not reliably apply the principles and methods to the facts of the case. Appellants reason that F.D. has no personal experience with Vyvanse toxicity leading to death, and without that experience, medical literature must support his testimony. According to Appellants, the medical literature did not support F.D.'s opinion as to K.P.'s cause of death.

"Nowhere does Section 490.065 . . . require complete identity or exact similarity between the proffered opinion and the medical study relied on in forming the opinion." *Revis v. Bassman*, 604 S.W.3d 644, 656 (Mo. App. E.D. 2020). F.D. relied on articles and studies dealing with amphetamines as a cause of stokes and, more specifically, Lizdexamfetamine overdose, the toxicity of Lizdexamfetamine, and some of its side effects. F.D. also relied on an article regarding Vyvanse and ischemic strokes caused by blocked or reduced blood flow to the brain, as opposed to hemorrhagic strokes caused by a hemorrhaged blood vessel in the brain. As F.D. explained and defense expert J.T. conceded at trial, the medical literature shows that amphetamines increase the risk of cerebral hemorrhage. Though the literature deals with amphetamines generally and not Vyvanse specifically, both experts agreed that Vyvanse is an amphetamine with the same physiological effects as other amphetamines.

15

For all of these reasons, Point II is denied.

## Point III

In their third point, Appellants argue the trial court erred in allowing the introduction of K.P.'s death certificate into evidence without limitation because the medical examiner lacked personal knowledge of the cause of death.

*Preservation*

Plaintiff contends that Appellants failed to preserve this issue for appeal because Appellants' objection to the admission of the death certificate and the conclusions contained therein was untimely. Plaintiff reasons that the conclusions contained in the death certificate were previously admitted through other testimony without objection. Appellants reply that the point is preserved because they objected to the admission of the physical death certificate and its conclusions, and the objection was maintained in Appellants' motion for new trial.

We need not decide whether Appellants preserved this issue because, even assuming the issue was preserved, Appellants cannot establish that the trial court abused its discretion.

*Standard of Review*

A trial court's decision to admit evidence is reviewed for abuse of discretion. *Revis*, 604 S.W.3d at 649. "We will find an abuse of discretion only when the trial court's ruling is clearly against the logic of the circumstances then before the trial court and . . . so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Id.* at 650. "To prevail on appeal under the abuse of discretion standard, an appellant must demonstrate both that the trial court erred and that the error prejudiced the outcome of the verdict." *Id.*

*Analysis*

16

"A certified copy of a death certificate is prima facie evidence of the facts stated therein and is generally admissible, both to prove death and to offer some evidence as to the immediate cause of death." *Voss v. State*, 570 S.W.3d 184, 194 (Mo. App. E.D. 2019); *Johnson v. Missouri Bd. of Nursing Adm'rs*, 130 S.W.3d 619, 641 (Mo. App. W.D. 2004); *see also* Section 193.255.2 ("A certified copy of a vital record or any part thereof, issued in accordance with subsection 1 of this section, shall be considered for all purposes the same as the original and shall be prima facie evidence of the facts stated therein . . ..").

In *State v. Croka*, 693 S.W.2d 133, 135 (Mo. App. W.D. 1985), the appellant challenged the admission of the victim's death certificate. The appellant argued that the State failed to call any medical witness to testify concerning the cause of death. *Id.* The Court rejected the appellant's challenge, finding that "the fact that the coroner did not appear as a witness for the state to narrate the contents of the death certificate he had prepared, and be cross-examined on the subject, does not disqualify the death certificate as a record entitled to admission in evidence." *Id.* at 136. The Court stated, "By legislative directive, a death certificate is prima facie evidence of the facts stated therein. . . The fact that no autopsy was performed and no inquest was held would, at most, go to the credence of the opinion." *Id.* at 135. Also, "the cause of death as set out in the death certificate was reinforced by all the other evidence in the case so that the certificate was not the sole proof of the conclusion." *Id.*

Here, as already mentioned, there was other substantial evidence of K.P.'s cause of death. For instance, Plaintiff offered into evidence the long-form report of the St. Louis County Medical Examiner's Office. The trial court received the report into evidence without objection from Appellants. The long-form report contained all of the information in the death certificate and more, including the cause of death as determined by the Medical Examiner's Office. Thus, Appellants

17

fail to establish either an abuse of discretion or any prejudice from the admission of the death certificate. *See Delacroix v. Doncasters, Inc.*, 407 S.W.3d 13, 45 n. 23 (Mo. App. E.D. 2013) (en banc) (quoting *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 134 (Mo. banc 2007)) ("A party cannot be prejudiced by the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection.").

Point III is denied.

Point IV

In their fourth point, Appellants argue the trial court erred in allowing aggravating circumstances damages to be submitted to the jury because there was no evidence of intentional wrongdoing.

*Mootness*

Before addressing the merits of Point IV, we consider whether Point IV is moot in the circumstances presented here, including that the jury ultimately did not award aggravating circumstances damages. A point "is moot when the question presented for decision seeks a judgment upon some matter which, if the judgment was rendered, would not have any practical effect upon any then existing controversy." *State ex rel. Gardner v. Boyer,* 561 S.W.3d 389, 394 (Mo. banc 2018) (quoting *State ex rel. Hawley v. Heagney,* 523 S.W.3d 447, 450 (Mo. banc 2017)).

Here, the jury, after rendering a verdict in favor of Plaintiff and awarding $5 million in compensatory damages, chose not to award any damages for aggravating circumstances. Appellants fail to identify any existing controversy and offer no factual or legal support for their bald assertion that the submission of aggravating circumstances was prejudicial "because it likely directly impacted the amount of non-economic damages awarded by the jury." The most Appellants can muster is speculation that, "[w]hile the jury did not award damages for aggravating

18

circumstances, we have no reason to believe that the argument didn't taint their overall deliberations." Appellants' assertion is particularly speculative considering that the trial court reduced the compensatory damages award to $801,061 pursuant to the medical malpractice liability limitations in Section 538.210. Without more, we can conclude only that any decision by this Court regarding the admissibility of aggravating circumstances damages in this case would have no practical effect on any existing controversy. The point is moot. *See Boyer,* 561 S.W.3d at 394.

Point IV is denied.

## Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

_____
Cristian M. Stevens, J.

Robert M. Clayton III, P.J., and
Philip M. Hess, J., concur.

19